PITMAN, J.
Defendant Donea L. Jackson was convicted of attempted first degree murder. The trial court sentenced him to 40 years' imprisonment without the benefit of probation, parole or suspension of sentence. Defendant appeals his conviction and sentence. For the following reasons, we affirm Defendant's conviction and sentence as amended.
FACTS
On February 3, 2015, the state charged Defendant with attempted first degree murder, alleging that on or about December 8, 2014, he attempted to commit first degree murder upon Airrik Walker. At arraignment, Defendant entered a plea of not guilty. On February 10, 2017, the state filed an amended bill of information that specified that Defendant attempted to kill Walker while having the specific intent to kill and being engaged in the perpetration *649 or attempted perpetration of armed robbery.
On December 27, 2016, the state filed a motion in limine. It sought to introduce statements made by Defendant to law enforcement, hospital staff, paramedics and first responders in which he expressed that he shot Walker, apologized for the shooting and stated that the shooting involved a concern over money. The state provided notice to the defense that it intended to use other crimes evidence at trial. It alleged that Defendant made plans to commit a robbery on a different target on the night before the present alleged offense. It explained that this robbery was discussed with Brandon Malone and April Walker ("April")[1] and that the gun used to shoot Walker was brought for the purposes of the robbery discussed on December 7, 2014.
On January 17, 2017, Defendant filed a motion to suppress statements by Melissa Gillum, a physician's assistant who assessed Defendant's injuries when he was taken to the hospital. He claimed the heath care provider-patient privilege set forth in La. C.E. art. 510(C)(1).
On February 2, 2017, a hearing was held on the state's motion in limine, during which it introduced video recordings of police interviews with Malone and April concerning the events of December 7, 2014. In an October 7, 2015 interview, Malone stated that on the evening of December 7, 2014, Defendant obtained a gun from April and planned to rob someone called "C-Rock." Malone explained that Defendant needed money to leave town. He stated that on December 8, 2014, Defendant told him that he was going to go with Walker to sell drugs. He later received a call from Defendant that he had been injured in a car accident. In a September 28, 2015 interview, April stated that Defendant asked her for her gun so that he could rob someone called "Termite." She stated that Defendant agreed to give her $2,000 obtained from robbing Termite in exchange for using her gun. She noted that she did not hear Defendant or Malone mention Walker's name as a possible target. The trial court granted the state's motion, finding that any prejudice Defendant would suffer from the admission of the other crimes evidence was outweighed by its probative value.
A hearing on Defendant's motion to suppress was held on February 8, 2017. The trial court found that the statements Defendant made while in the emergency room to physician's assistant Melissa Gillum and nurse Shawna Chellette were not privileged. It explained that the statements were not confidential because Defendant was volunteering information and made the same statements to several other individuals after the accident.
Trial began on February 21, 2017. Eva Peoples, a volunteer firefighter, testified that on the morning of December 8, 2014, she received a first-responder call to a one-vehicle accident. Upon arriving at the scene, she observed an overturned vehicle and Defendant lying on the ground. He told her he was in severe pain in his lower body. She informed him that help was on the way and noticed a cell phone lying on his chest. Defendant indicated that someone was on the phone, but she received no response when she spoke into the phone. She later gave Defendant's phone to a law enforcement officer. Peoples noted that other first responders attended to another individual at the scene and that when the paramedics arrived, they told her that the other person had a gunshot wound. Peoples stated that before she left the scene, *650 she spoke to Defendant again and asked him who shot the other person. She testified that Defendant admitted to shooting him and then apologized and asked for forgiveness from God.
First responder Eileen Murphy Daniels testified that when she arrived at the scene, she assessed a man with gunshot wounds to his head and chest. She noted that she initially thought he was dead, but after assessing him, knew he was still alive.
First responder Sharon Usrey testified that when she arrived at the scene, she attended to a man who had pain from the waist down. She noted that he was conscious and that he repeatedly stated, "I'm so sorry," "I made a mistake," "I really messed up" and "I didn't mean to shoot him."
First responder Lyndell Usrey testified that when he arrived at the scene, he attended to a man who had leg and hip injuries. He identified this man to be Defendant. He noted that Defendant was conscious and made statements including, "I've messed up," "Made a mistake," "I shouldn't have done it" and "I don't know why I did it."
Deputy Chase Walsworth of the Ringgold Police Department testified that he was a first responder and assisted in rendering aid to two patients. He first encountered Walker, who was in critical condition with gunshot wounds to the chest and temple. He then aided Defendant, who complained of pain to his legs and back. Dep. Walsworth testified that Defendant stated, "I didn't meant to shoot him" and "I'm sorry, I messed up."
First responder Rita Plunkett testified that when she arrived at the scene, she observed Defendant lying on the ground. He told her he had pain in his legs and back and asked her to speak on the phone to his brother. She explained that she picked up his phone and told the person on the phone that help would be there shortly. She noted that Defendant stated, "Murph, I'm sorry" and "I'm sorry, man."
Deputy Dudley Poda of the Bienville Parish Sheriff's Office testified that he was dispatched to the scene of a single-vehicle rollover accident. He stated that first responders did not find any identification on Defendant, but Defendant provided his name and date of birth. When Dep. Poda asked Defendant what happened, he replied, "I fucked up and shot him." Defendant told Dep. Poda that the gun was still in the vehicle. Dep. Poda searched for a gun for safety purposes, but did not locate one.
Paramedic Jason Rice testified that he was dispatched to the scene and attended to Defendant, who was complaining of hip and leg pain.[2] He asked Defendant questions to determine whether he was lucid and concluded that he was alert and oriented to what was going on. When Rice asked what had happened, Defendant stated that he attempted to jump into the driver's seat when the crash occurred. Rice rode in the ambulance with Defendant, who told him that "he should have just asked him for the money, he probably would've given it to him." Rice noted that Defendant's father arrived at the scene before Defendant was transported by ambulance, and Defendant told him, "I'm sorry, Dad, I messed up."
Deputy James Stewart of the Bienville Parish Sheriff's Office testified that he responded to the scene at approximately 10:00 a.m. and recorded the scene with his body camera while he searched the area. A *651 recording of the footage taken from Dep. Stewart's body camera was admitted into evidence and published to the jury. In the footage, Defendant can be heard saying "I'm sorry" and "I fucked up." Dep. Stewart stated that a .38 caliber revolver was found inside the vehicle.
Aaron Johnson, an emergency medical technician for the Jackson Parish Ambulance Service, testified that he responded to the scene and provided aid to Walker and Defendant. He noted that Walker had been ejected from the vehicle, his foot was pinned under it and he had gunshot wounds to the head and chest.
First responder Amy Walsworth testified that she attended to Walker, who had been shot in the head and chest and appeared to be in shock. She noted that he screamed, "Why'd you shoot me?" to Defendant, and Defendant replied, "I'm sorry, man. I'm sorry." She stated that Walker then said, "I had the money, I would've gave it to you."
Malone testified that he has known Defendant and his family for his whole life. He stated that on the night of December 7, 2014, he received a text message from Defendant stating that April was going to bring Defendant a gun. He responded that he was coming to Defendant's house, and when he arrived, he asked Defendant why he needed a gun. Defendant responded that he would use the gun to rob someone called "C-Rock" or possibly Walker. He attempted to dissuade Defendant from robbing Walker by telling him that Walker had no money. He stated that April arrived at Defendant's house later that evening and that he tried to calm Defendant down by taking him for a drive. He dropped Defendant off at home and then returned to his house. Malone testified that the following morning, he went to his mother's house, which is located next door to Defendant's house, and met Defendant. He then drove Defendant to his house and cooked breakfast for him. Walker arrived a few minutes later, and he purchased $20 worth of marijuana from him. Defendant and Walker then left in Walker's vehicle, purportedly to sell drugs in Saline, Louisiana. He stated that later that morning, he received a call from Defendant, stating that he had been injured in a car accident. During the conversation, Defendant mentioned a white man picking up drugs. On cross-examination, he stated that Walker always claimed to have money, but he did not know if Walker carried a gun. He also recanted some of his earlier testimony, stating that Defendant did not specifically say he was going to rob Walker.
April, Defendant's former girlfriend, testified that in December 2014, she was employed by Securitas as a security guard. She explained that she was required to carry a weapon when working at Grambling University and that her employer issued her a Smith & Wesson .38 caliber revolver. She stated that on December 7, 2014, Defendant texted her and asked if he could use her gun to rob someone. Defendant agreed to give her some money if he accomplished the robbery. She went to Defendant's house and Defendant, Malone and two other people were present. She gave her gun to Defendant, and he left the house with the gun. Defendant later returned home after unsuccessfully attempting to rob someone called "Termite." April testified that she then went home and went to bed. The next morning, December 8, 2014, April received a text from Defendant, in which he indicated that he was about to rob someone. She stated that later that day, a friend called her and informed her that Defendant had shot someone called "Murph." She was afraid the gun would be traced back to her, and she called the police and her employer and told them that Defendant stole the gun.
*652 She testified that she visited Defendant in jail after his arrest. During their conversation, he told her that he shot Walker because of drugs and money and that after the vehicle crashed, he called Malone to collect the drugs and money from the accident scene. She identified State's Exhibit No. 6 as the Smith & Wesson .38 caliber revolver she gave to Defendant. The serial number from the revolver entered into evidence matched the serial number of the revolver issued to April by her employer.
Donna Norman testified that in December 2014, she was the branch manager for Securitas in Monroe, Louisiana, and was responsible for issuing weapons to Securitas employees. She identified State's Exhibit No. 6 as the weapon she issued to April.
Sergeant Darrell Mills of the Bienville Parish Sheriff's Office testified that he was dispatched to the accident scene. He took photographs as part of his investigation and identified several of the photographs during his testimony. In photographs of the driver's side of the vehicle, he noted that what appeared to be blood had soaked into the driver's seat and the arm rest and had spattered on the steering wheel, door panel and ceiling. A shirt found at the scene was soaked in blood and had matching holes on the front and back. He testified that during his examination of the scene, he discovered glass on the road several hundred feet from where the vehicle crashed. He also collected similar looking glass from inside the vehicle that came from a shattered window. A Smith & Wesson .38 caliber revolver was found on the floorboard of the vehicle. When he opened the revolver's cylinder, he observed two spent casings and four live rounds. He stated that he did not observe anything that would have caused the vehicle to crash other than the shooting.
Sergeant Chris Davis testified that he was responsible for collecting the evidence referenced by Sgt. Mills. He added that the bloody shirt collected from the scene belonged to Walker and that the holes in the shirt had burn marks. He testified that after leaving the scene, he made contact with Defendant at the hospital and advised him of his Miranda rights. He noted that Defendant did not want to speak to him at that time because he was in too much pain.
Sgt. Davis further testified that he obtained a warrant for Defendant's arrest; and, on December 18, 2014, Defendant's family brought him to the courthouse to be arrested. He advised Defendant of his Miranda rights and then interviewed him. A recording of the interview was admitted into evidence and played for the jury. In the interview, Defendant stated that Walker had loaned him several hundred dollars three weeks before the shooting. On the morning of the shooting, Walker picked him up in his vehicle and repeatedly asked him when he would repay him. Defendant stated that he knew Walker had a gun and that Walker appeared to reach for a gun. He responded by pulling his own gun and shooting Walker in the arm and then in the head. Defendant stated that he then tried to get into the driver's seat, but he lost control of the vehicle and it crashed. He admitted he never actually saw the gun that he thought Walker had.
Sgt. Davis further testified that he obtained a warrant to search Defendant's cell phone, which revealed a series of text messages with April and Malone sent on the night of December 7, 2014, conspiring to commit a robbery in Jackson Parish. In the text message conversation, Defendant informed Malone that April was to receive $2,000 from the robbery proceeds for providing a gun. On the morning of December 8, 2014, Defendant sent a text message to April, informing her that he was "back on *653 it." That same morning, Defendant sent a text message to Malone informing him of his and Walker's location.
Sgt. Davis also testified that he interviewed Malone and April, and both admitted to being in contact with Defendant the morning of the shooting. He stated that no other gun was found at the crash scene, despite Defendant's claim that he shot Walker in self-defense. He admitted that after investigators found the .38 caliber revolver at the scene, no efforts were made that day to search for another gun. It was not until Defendant asserted that he acted in self-defense in his December 18, 2014 interview that investigators returned to the scene to search for a second gun.
Melissa Gillum, a physician's assistant, testified that Defendant was lucid when he was brought to the emergency room for treatment. While being treated, he told Gillum that he was in the passenger seat of the vehicle, shot the driver and then tried to jump into the lap of the driver to drive the car. He informed Gillum that he was trying to get back on his feet and needed money to leave town. He stated that Walker was his friend, and he knew Walker had money. He then stated, "Well, I guess I could've just asked him for [the money]."
Walker testified that he could not remember what occurred in 2014 or that he knew Defendant. He stated that he was told that he lost his vision after being shot and that he is being cared for by his grandmother.
Lillian Walker, Walker's grandmother, testified that she saw Walker the morning of December 8, 2014, when he collected clothes from her home and then later that same day when he was in the emergency room. She stated that he remained in the hospital until January 16, 2015, then stayed at a nursing home for a year and then moved in with her. She added that Walker lost his vision and the ability to walk as a result of the shooting and also suffers from short-term memory loss.
The state then rested, and Defendant called four witnesses. Joseph Scallion, Mary Bunker and Joshua Ponder testified that they lived near the crash scene and were the first three people to arrive at the scene. Bunker called the police after hearing the crash. All three testified that they did not examine the scene or remove any evidence from the scene. Ponder recalled hearing Defendant yell that he "fucked up." He added that two weeks after the incident, he was asked by two unidentified men about the wreck and about drugs and money.
Defendant recalled Malone to testify. Malone stated that Walker's name was mentioned during a conversation between him, Defendant and April, but insisted that Walker was only mentioned in passing. He denied planning an armed robbery with Defendant and April the night before the shooting. He stated that on the morning of December 8, 2014, he believed that Defendant and Walker left his house to sell drugs. He did not believe that Defendant was going to shoot Walker.
On February 23, 2017, the jury found Defendant guilty as charged. On April 4, 2017, the trial court sentenced him to serve 40 years without the benefit of probation, parole or suspension of sentence. The state filed a habitual offender bill, and Defendant pled not guilty. The trial court denied Defendant's motion to reconsider sentence.
Defendant appeals his conviction and sentence.
DISCUSSION
Insufficient Evidence
Defendant argues that he acted in self-defense and that the evidence was insufficient *654 to convict him of attempted first degree murder. He explains that when he was in the car with Walker, Walker became agitated with him because he had not repaid a loan. Defendant believed that Walker was reaching for a gun, so he shot him in self-defense. Although only one gun was found at the scene, he argues that the investigating officers failed to properly search for a second gun after they located the gun used by him. He further argues that the statements he made immediately following the accident were made while he was in a significant amount of pain and medicated with an opioid, making it likely that he misspoke. He contends that the state failed to meet its burden of proof. He states that it defies logic that he intended to commit an armed robbery because, if he had intended to rob Walker, he would have done so when they were not in a moving vehicle where his own life was at risk.
The state argues that there is sufficient evidence to support Defendant's conviction and that it proved each element of the crime beyond a reasonable doubt.
The standard of review for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Hearold , 603 So.2d 731 (La. 1992) ; State v. Smith , 47,983 (La. App. 2d Cir. 5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 96-1048 (La. 10/4/96), 680 So.2d 1165.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writ denied , 02-2595 (La. 3/28/03), 840 So.2d 566, and writ denied , 02-2997 (La. 6/27/03), 847 So.2d 1255, and cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed. 2d 90 (2004). An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in a light most favorable to the prosecution. Id. When the direct evidence is thus viewed, the facts established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id. , citing State v. Sutton , 436 So.2d 471 (La. 1983), and State v. Owens , 30,903 (La. App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied , 98-2723 (La. 2/5/99), 737 So.2d 747.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 14-0990 (La. 1/16/15), 157 So.3d 1127, citing State v. Moore , 44,429 (La. App. 2 Cir. 8/26/09), 20 So.3d 1137. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Broome , supra .
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , supra , citing State v. Tolliver , 35,930 (La. App. 2 Cir. 5/8/02), 818 So.2d 310, and State v. Bacon , 578 So.2d 175 (La. App. 1 Cir. 1991), writ denied , 93-0694 (La. 3/30/95), 651 So.2d 857. The trier of fact makes credibility determinations and may accept or reject *655 the testimony of any witness. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed. 2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508.
La. R.S. 14:30 states, in pertinent part:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery....
La. R.S. 14:27(A) defines "attempt" and provides:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
La. R.S. 14:19(A)(1) sets forth, in pertinent part, that in a non-homicide case, the use of force or violence upon the person of another is justifiable:
(a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.
The issue of self-defense requires a dual inquiry, an objective inquiry into whether the force used was reasonable under the circumstances and a subjective inquiry into whether the force was apparently necessary. State v. Robinson , 37,043 (La. App. 2 Cir. 5/14/03), 848 So.2d 642. The standard of proof when a defendant claims self-defense in a non-homicide case is a preponderance of the evidence. Id. In some cases, this and other courts have also required that the state must then prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Williams , 50,004 (La. App. 2 Cir. 9/30/15), 178 So.3d 1051. However, the Louisiana Supreme Court has not clearly approved of this additional burden. Id. In the case sub judice , the jury was instructed that the defense has the burden of proof to prove by a preponderance of the evidence that his actions were in self-defense and that the state must prove beyond a reasonable doubt that the defendant did not act in self-defense.
The state presented sufficient evidence to support Defendant's conviction. It proved beyond a reasonable doubt that Defendant had the specific intent to kill Walker during the commission of an armed robbery.
Defendant admitted that he shot Walker. First responders, law enforcement and hospital staff testified to statements Defendant made to them immediately following the vehicle accident in which he admitted to shooting Walker and expressed his remorse. He again admitted to shooting *656 Walker when he spoke with law enforcement ten days after the incident. Defendant's argument that his statements to first responders were made under extreme pain and medication is meritless as the first responders testified that he was lucid during treatment, and he corroborated his statements during his December 18, 2014 interview with law enforcement. Defendant's admissions prove that he acted with the specific intent to kill or inflict great bodily harm upon Walker when he shot him in the head.
Defendant argues that he shot Walker while acting in self-defense and not during an armed robbery. The only evidence offered to support Defendant's self-defense claim is his own self-serving statement made during his December 18, 2014 interview with law enforcement. In this interview, he stated that he shot Walker in the arm and then in the head because he thought Walker was reaching for a gun. Also during this interview, he admitted that he never saw the alleged gun. This suggests that even if Walker had been armed, his weapon was not drawn and Defendant's use of force was unreasonable. Further, law enforcement only recovered one gun at the scene-the .38 caliber revolver that April testified she gave to Defendant the night before the shooting so that he could commit an armed robbery. The only shell casings found at the scene were in the revolver's chamber. No evidence suggesting the possible presence of another gun was found.
April testified that she gave Defendant the gun to commit a robbery in exchange for receiving a portion of the money obtained in the robbery. Malone added that the night before the shooting, Defendant named several possible targets of the planned robbery, including Walker. Paramedic Jason Rice testified that Defendant told him that he should have just asked Walker for the money and that Walker would have given him the money. First responder Amy Walsworth testified that Walker asked Defendant why he shot him and that Walker told Defendant that he had the money and would have given it to him. The testimony of these witnesses demonstrates that Defendant was engaged in the perpetration or attempted perpetration of armed robbery when he shot Walker.
Defendant did not prove a by a preponderance of the evidence that he acted in self-defense. The state met its burden of proving beyond a reasonable doubt that the attempted homicide was not perpetrated in self-defense. A rational jury could have found that the attempted homicide was not committed in self-defense or in the defense of others and was, instead, committed during an armed robbery.
Accordingly, this assignment of error lacks merit.
Other Crimes Evidence
Defendant argues that the trial court erred in allowing the state to introduce evidence of other crimes unrelated to this incident, i.e., statements made by April and Malone regarding his intent to commit armed robbery. He notes that the statements introduced at the hearing on the motion in limine were inconsistent-Malone stated that the intended victim was C-Rock, and April stated that they planned to rob Termite. Defendant contends that the purpose of admitting the other crimes evidence was to establish his bad character rather than to prove Walker was the intended victim.
The state argues that the purpose of the other crimes evidence was to show that hours before the incident at issue in this case, Defendant planned to commit an armed robbery with April and Malone. The state explains that the evidence shows *657 when, where and how Defendant acquired the gun used to shoot Walker and demonstrates that the robbery was part of a continuous plan for him to acquire money so that he could leave the area. The state notes that in his testimony, Malone named Walker as a possible target of armed robbery.
La. C.E. art. 404(B)(1) provides:
Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes that he is a "bad person." State v. Richardson , 46,360 (La. App. 2 Cir. 6/22/11), 71 So.3d 492, citing State v. Jackson , 625 So.2d 146 (La. 1993). This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his unrelated criminal acts. State v. Jones , 50,270 (La. App. 2 Cir. 2/10/16), 188 So.3d 268, writ denied , 16-0858 (La. 5/1/17), 220 So.3d 742, citing State v. Prieur , 277 So.2d 126 (La. 1973).
The trial court did not err in admitting the testimony of April and Malone in which they detailed how Defendant acquired the gun and planned to commit armed robbery the night before the shooting. This testimony was admissible to demonstrate Defendant's preparation and plan to commit a robbery, and it relates to conduct that constitutes an integral part of the act that is the subject of the present proceeding. This evidence was not admitted in an attempt to depict Defendant as a bad person.
Accordingly, this assignment of error lacks merit.
Suppression of Statement
Defendant argues that the trial court erred in not suppressing the statements made by Defendant to Gillum and Shawna Chellette[3] while he was being treated in the emergency room. He contends that the heath care provider-patient privilege extends to all hospital personnel and barred Gillum from disclosing a confidential communication made by him during the course of receiving treatment.
The state argues that Defendant's statements to hospital personnel were not privileged because he waived the privilege by making the same statements to other individuals, including first responders attending to him at the crash scene.
La. C.E. art. 510(C)(1) sets forth the health care provider-patient privilege in criminal proceedings and states:
In a criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or *658 among himself, his representative, and his physician or psychotherapist, and their representatives.
La. C.E. art. 510(C)(2) sets forth exceptions to this privilege.
The trial court properly denied Defendant's motion to suppress because the statements he made to Gillum and other hospital personnel do not fall within the heath care provider-patient privilege. At trial, Gillum testified that in an effort to assess Defendant's injuries, she asked him where he was sitting in the vehicle prior to the crash. He informed her that he was sitting in the passenger seat; but, after he shot Walker, he climbed into the driver's seat in an effort to gain control of the vehicle. Although Defendant's location alone might have fallen under the health care provider-patient privilege as it was asked for the purpose of diagnosing any additional injuries he may have suffered from the crash, his admission to shooting Walker bears no connection to his treatment or diagnosis. Therefore, it is not a privileged communication under La. C.E. art. 510(C).
Accordingly, this assignment of error lacks merit.
Pro Se Motions
Defendant argues that the trial court erred in informing him that he could not file motions in this case and insisting all motions be filed by his counsel of record. He argues that pursuant to State v. Melon , 95-2209 (La. 9/22/95), 660 So.2d 466, lower courts must accept and consider filings from represented defendants in a pre-verdict context whenever doing so will not lead to confusion at trial.
The state argues that State v. Melon , supra , is distinguishable from the instant case, as it refers to a defendant's right to file pro se briefs and pro se assignments of error to lower appellate courts, not to trial court motions.
A defendant's meaningful access to the courts is guaranteed by La. Const. art. 1, §§ 2, 19 and 22. State v. Melon , supra . It is well settled in Louisiana, however, that a trial court is not required to entertain motions filed by a defendant when the defendant is represented by counsel and entertaining such motions will lead to confusion at trial. State v. Holmes , 06-2988 (La. 12/2/08), 5 So.3d 42, cert. denied , 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed. 2d 233 (2009) ; State v. Melon , supra ; State v. McCabe , 420 So.2d 955 (La. 1982) ; State v. Outley , 629 So.2d 1243 (La. App. 2 Cir. 1993), writ denied , 637 So.2d 476 (La. 1994). While an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative. State v. Holmes , supra , quoting State v. McCabe , supra . Courts are required to accept and consider post-verdict pro se filings from represented defendants. State v. Melon, supra.
During a pretrial hearing on January 4, 2017, Defendant sought to file a pro se motion to suppress and complained that his attorney did not file a motion for speedy trial that he requested. The trial court explained to Defendant that his attorney would determine what motions should be filed and that he could file motions only through his attorney. Regarding the motion to suppress, defense counsel previously filed a motion to suppress statement regarding Melissa Gillum. Defense counsel also agreed with the state that statements made by Defendant at the scene were res gestae or excited utterances, which is why a motion to suppress was not filed as to those statements. Regarding the motion for speedy trial, the trial court was informed of this motion on *659 January 4, 2017, and the trial was scheduled to begin on February 21, 2017.
The trial court properly ordered Defendant to file motions through his counsel as he does not have an absolute right to file pretrial pro se motions if those motions would lead to confusion at trial.
Accordingly, this assignment of error lacks merit.
Excessive Sentence
Defendant argues that the sentence imposed is unconstitutionally harsh and excessive and that the trial court did not adequately state a basis for the sentence imposed. He contends that the trial court failed to consider his social and employment history and accused him of lacking remorse when the evidence established that he repeatedly expressed remorse.
The state argues that Defendant's sentence is not excessive. It notes that the trial court likely did not comment on Defendant's employment history because he lacked a significant employment history due to being in and out of jail. It explains that although Defendant expressed remorse immediately after the car crash, there was no showing of remorse at any time thereafter. It notes that as a result of Defendant's actions, Walker, who was in his mid-20s, suffered blindness, brain damage and permanent loss of mobility.
When reviewing an excessive sentence claim, the appellate court uses a two-prong test. First, the record must demonstrate that the trial court complied with La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating and mitigating circumstance, but the record must reflect that it adequately considered the guidelines of La. C. Cr. P. art. 894.1. State v. Smith , 433 So.2d 688 (La. 1983). The trial court should consider the defendant's personal history and prior criminal record, the seriousness of the offense, the likelihood that the defendant will commit another crime and the defendant's potential for rehabilitation. State v. Jones , 398 So.2d 1049 (La. 1981). The trial court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao , 36,587 (La. App. 2 Cir. 12/11/02), 833 So.2d 1103, writ denied , 03-0477 (La. 5/16/03), 843 So.2d 1130.
Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence is excessive and violates La. Const. art. 1, § 20, if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno , 384 So.2d 355 (La. 1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id.
A trial court has wide discretion in imposing a sentence within the statutory limits, and a sentence should not be set aside absent a showing of abuse of discretion. State v. Square , 433 So.2d 104 (La. 1983) ; State v. Black , 28,100 (La. App. 2 Cir. 2/28/96), 669 So.2d 667, writ denied , 96-0836 (La. 9/20/96), 679 So.2d 430. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Free , 46,894 (La. App. 2 Cir. 1/25/12), 86 So.3d 29.
First degree murder is punishable either by death or life imprisonment. La. R.S. 14:30(C). Any person who attempts to commit a crime that is punishable by death or life imprisonment shall be imprisoned at hard labor for not less than 10 nor more than 50 years without the benefit of probation, parole or suspension of sentence. La. R.S. 14:27(D)(1)(a).
*660 In the case sub judice , the trial court complied with the requirements of La. C. Cr. P. art. 894.1 and considered aggravating and mitigating factors prior to imposing Defendant's sentence. Noting La. C. Cr. P. art. 894.1(A)(3), it determined that a lesser sentence would deprecate the seriousness of Defendant's crime. Considering the La. C. Cr. P. art. 894.1(B) factors, it found that Defendant intended to kill Walker, as evidenced by his shooting Walker in the chest and head; that he used actual violence in the commission of the offense; and that he used a dangerous weapon, i.e., a handgun, in the commission of the crime. It noted that the offense resulted in significant permanent injury to Walker in that he is unable to walk and is blind. It also found that Defendant showed no remorse for his actions. It stated that Defendant's presentence investigation report detailed his criminal history. It further noted that prior to trial, Defendant rejected a plea deal of 35 years' imprisonment.
Defendant's sentence of 40 years' imprisonment is not constitutionally excessive and is within the statutory range set forth in La. R.S. 14:27(D)(1)(a).
Considering the facts of this case, the sentence imposed by the trial court is not grossly out of proportion to the severity of the crime and does not shock the sense of justice. It did not abuse its discretion in imposing this sentence.
Accordingly, this assignment of error lacks merit.
ERROR PATENT
A review of the record demonstrates that at the sentencing hearing, the trial court failed to impose Defendant's sentence at hard labor.[4] Pursuant to La. R.S. 14:27(D)(1)(a), any person who attempts to commit a crime that is punishable by death or life imprisonment shall be imprisoned at hard labor for not less than 10 nor more than 50 years without the benefit of probation, parole or suspension of sentence. Pursuant to La. R.S. 14:30(C), first degree murder is punishable either by death or life imprisonment. Because La. R.S. 14:27(D)(1)(a) requires that the sentence be served at hard labor, the trial court's error is harmless and self-correcting. See State v. Foster , 50,535 (La. App. 2 Cir. 4/13/16), 194 So.3d 674. Accordingly, we amend Defendant's sentence to reflect that it is to be served at hard labor in accordance with La. R.S. 14:27(D)(1)(a).
CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant Donea L. Jackson are affirmed. His sentence is amended to reflect that it is to be served at hard labor.
AFFIRMED AS AMENDED.

April Walker is not related to Airrik Walker.

Paramedic Rice was unable to identify Defendant at trial, but confirmed that the man complaining of hip pain identified himself as Donea Jackson.

Shawna Chellette did not testify at trial.

The minutes of the trial court reflect that Defendant's sentence is to be served at hard labor. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch , 441 So.2d 732 (La. 1983).