GRAVOIS, J.
*238 Defendant, John Paul Devillier, was convicted by a jury of attempted first degree murder of a peace officer, Corporal Burt Hazeltine. On appeal, he argues multiple assignments of error as noted below. Upon review, for the following reasons, we find no reversible error and affirm defendant's conviction and sentence.
PROCEDURAL HISTORY
On May 12, 2015, the St. Charles Parish District Attorney filed a bill of information charging defendant, John Paul Devillier, with the attempted first degree murder of a peace officer, Corporal Burt Hazeltine of the St. Charles Parish Sheriff's Office, in violation of La. R.S. 14:27 and La. R.S. 14:30. Immediately prior to the filing of the bill of information on May 12, 2015, a sanity hearing was held[1] and defendant was found competent to proceed to trial. Defendant then waived reading of the bill of information and entered a plea of not guilty.
At a hearing on August 4, 2015, and in writing on September 14, 2015, defendant withdrew his plea of not guilty and entered the dual plea of not guilty and not guilty by reason of insanity. On October 5, 2015, a sanity commission composed of Dr. Richard Richoux and Dr. Rafael Salcedo was appointed by the trial court to determine defendant's mental condition at the time of the alleged offense.
On August 23, 2016, the State filed a motion to produce defendant for an independent mental examination by Dr. John W. Thompson, Jr., and on September 6, 2016, the trial court granted the State's motion after a hearing. Defendant filed a writ application with this Court seeking review of the ruling to produce him for the mental examination, which this Court denied. See State v. Devillier , 16-535 (La. App. 5 Cir. 9/20/16) (unpublished writ decision).
*239 On January 24, 2017, the trial court held a hearing on the State's La. C.E. art. 404(B) Notice of Intent to Use Evidence of Other Bad Acts and Incorporated Supporting Memorandum. The trial court granted the State's motion to admit into evidence defendant's prior bad acts of refusing to cooperate with police commands and/or failure to surrender.
Trial commenced before a twelve-person jury on February 8, 2017. On February 14, 2017, the jury found defendant guilty as charged. On February 23, 2017, defendant filed a motion for a new trial and a motion for post-verdict judgment of acquittal, challenging the sufficiency of the evidence presented by the State at trial. After a hearing on April 11, 2017, the trial court denied defendant's motion for a new trial and motion for post-verdict judgment of acquittal.
On April 25, 2017, after considering a pre-sentencing investigation ("PSI") report, a victim impact statement, and La. C.Cr.P. art. 894.1, the trial court sentenced defendant to 40 years in the Department of Corrections[2] without the benefit of parole, probation, or suspension of sentence. On May 2, 2017, defendant filed a motion to reconsider sentence; the trial court denied the motion on June 13, 2017. Immediately after the motion to reconsider sentence was denied, defendant orally moved for and was granted an appeal. Defendant also filed a written motion for an appeal on June 13, 2017, which was granted that same day.
FACTS
On the morning of April 16, 2015, Corporal Burt Hazeltine with the St. Charles Parish Sheriff's Office was working a traffic control detail in a school zone at the corner of Louisiana Street and U.S. Highway 90 in Paradis, Louisiana, in St. Charles Parish. Corporal Hazeltine's assignment was to ensure that school buses serving nearby schools safely entered and exited Highway 90.[3]
Following his usual routine, Corporal Hazeltine arrived at the intersection that morning between 7:20 a.m. and 7:25 a.m. for take-in at J.B. Martin School. He planned to leave the area around 8:45 a.m. after the buses dropped the children off at R.J. Vial Elementary, another nearby school. Corporal Hazeltine was sitting in his marked police unit parked on the shoulder of Highway 90 near a Timesaver store close to Louisiana Street with his lights activated when a pickup truck pulled up beside his unit. Assuming that the person needed directions or help, Corporal Hazeltine exited his unit and began to approach the pickup truck when defendant, John Paul Devillier, the driver of the pickup truck,[4] began yelling at Corporal Hazeltine that he did not know how to do his job and that he knew Sheriff Greg Champagne and was going to call him. Defendant, who was described as irate, flashed what appeared to be a souvenir "Navy police" keychain out of his window. Corporal Hazeltine asked if he could help defendant, who replied in the negative. Defendant then put his truck in reverse and turned down Louisiana Street.[5]
*240 Sherry Champagne, the administrative assistant for Sheriff Champagne, received a phone call from defendant asking to speak to the Sheriff. Ms. Champagne informed defendant that the Sheriff was unavailable, upon which defendant explained that he wanted the Sheriff to meet him in the Timesaver's parking lot because he was upset with the way a deputy was directing traffic. Defendant became "more and more agitated" because Ms. Champagne would not put him through to the Sheriff.
Approximately fifteen or twenty minutes after defendant initially left the area, as Corporal Hazeltine was finishing his detail, he stepped out of his unit to remove his reflective vest when he saw that defendant's pickup truck had returned and was located in the driveway of the Timesaver. Remembering that defendant had been upset, Corporal Hazeltine walked from behind his unit to approach defendant's truck to converse with him. As Corporal Hazeltine approached the front of defendant's truck in which defendant sat, he saw a revolver laying on the dashboard of the truck.[6] Given defendant's previous irate behavior and the visibility of the gun, Corporal Hazeltine, who was standing approximately fifteen feet from his unit, drew his service weapon, began to move back towards his unit, and told defendant to show his hands. Corporal Hazeltine testified that in response, defendant's "right hand went up in the air and his left hand went out the driver's side window with a black semi-automatic pistol hanging from - with it hanging from the trigger guard." Corporal Hazeltine ordered several times for defendant to drop the weapon, but defendant refused.
At the time of defendant's return to the corner of Highway 90 and Louisiana Street, he contacted OnStar. In the call which was published to the jury, defendant identified himself and his location and can be heard yelling to Corporal Hazeltine not to approach and to call Sheriff Champagne. Defendant yelled to Corporal Hazeltine that he would "find out who [he (defendant) was] in a second." Corporal Hazeltine can be heard ordering defendant to show his hands and to put the gun down, and defendant is heard refusing to do so since he was "federal law enforcement."[7]
In a second OnStar call that was published to the jury, defendant told the OnStar operator that he needed the Sheriff's Office immediately. Defendant is heard saying: "I know what you need but I'm going to tell you what I need, see, I'm showing you mine your showing me yours you got yours pointed at me go ahead and fire it mother f**ker." At that time, gunfire can be heard, and the recording seems to indicate that defendant yelled: "I got two of them." After a lapse in the recording, defendant again requested assistance from the Sheriff because there was an officer who had a "problem" with him "pinned down." Defendant then appears to say to Corporal Hazeltine that he had a right to defend himself against anybody in *241 this country and "here they come" as sirens are heard approaching in the background. He stated that Corporal Hazeltine was going to lose his job, was "f**kin done," and "this [was his] parish you mother f**cker." He apologized for shooting him but said "god damnnit don't shoot at me."
Meanwhile, Corporal Hazeltine had radioed to dispatch that a suspect had a gun and was refusing to drop it. As Corporal Hazeltine focused on defendant's left hand hanging out the window with the weapon, he saw "the barrel of a gun coming up over the dashboard pointed at [him]."[8] Feeling that his life was being threatened, in response, Corporal Hazeltine fired his service weapon, a 40 caliber semi-automatic Glock Model 22, at defendant.[9] Defendant returned fire at Corporal Hazeltine and a gunfight ensued. Corporal Hazeltine was shot in the chest and in his arm just above his elbow, and a fragmented bullet passed through his left eye.[10] As the gunfight continued, Corporal Hazeltine fell to the ground in front of his patrol unit and dropped his service weapon, which landed several feet away from him. In order to not further expose himself, Corporal Hazeltine crawled behind his unit.
Lieutenant Roddy Landry, Lieutenant Rory Champagne, and Sergeant Jose Alvarenga with the St. Charles Parish Sheriff's Office heard Corporal Hazeltine's radio in that a subject in the school zone had a weapon followed by shots being fired. They proceeded to Paradis in each of their police vehicles, and upon arrival, they exited their units with weapons drawn and assumed tactical positions.
Defendant initially refused the officers' commands to drop his weapons, but finally tossed the weapons out of the open front driver's side window and into a grassy area. Sergeant Alvarenga, Lieutenant Landry, and Lieutenant Champagne surrounded defendant's truck and ordered him to exit the vehicle, which defendant refused to do. Defendant continually refused to obey the officers' commands. Eventually, Sergeant Alvarenga and Lieutenant Landry were forced to tase defendant to get him out of the vehicle. Once out of the vehicle, defendant continued to resist, falling into an adjacent ditch as he struggled *242 with the officers.[11] Eventually, the officers secured defendant in handcuffs and removed him from the ditch.
Both Major Rodney Madere and Sergeant Lance Richards responded to the scene as well and recalled defendant cursing and threatening the officers' jobs. Major Madere recalled that defendant screamed: "Man, I didn't want to hurt that officer, but he made me shoot him." Major Madere directed the officers to take defendant to headquarters. Sergeant Richards testified that as the officers tried to take defendant to headquarters, he "refused to stand up and wouldn't assist us in any way to walking him to a unit that was nearby." He continued to be uncooperative even after they reached headquarters.
Meanwhile, Sergeant Giovanni Tarullo with the St. Charles Parish Crime Scene Division arrived and began photographing and documenting the scene. A 9-mm Glock handgun and a 357 Smith & Wesson revolver were located next to defendant's truck near the ditch. Photographs reveal eleven spent 9-mm shell casings located on the cowl,[12] roof, and windshield wipers of defendant's truck and seven bullet holes in the truck's windshield. Also, 40 caliber casings were found around defendant's truck and Corporal Hazeltine's unit.
Inside defendant's truck, gun cases for the Glock handgun and the Smith & Wesson revolver, multiple boxes of various ammunition, and an empty magazine for the Glock were found on the floorboard of the front driver's seat. Near the center console was a brown fanny pack containing a 40 caliber Smith & Wesson handgun and two magazines containing 21 live rounds. The center console contained six fired 357 casings. Photographs of the passenger side of Corporal Hazeltine's unit depict six bullet holes lodged in various areas of the unit, including the driver's side headrest. It was learned that Corporal Hazeltine had seven bullets remaining in his gun chamber following the gunfight.
Technicians Joseph Marroccoli and Jason Troxler also took photographs to document the scene. Mr. Marroccoli went down Highway 90, away from the incident, and observed an AT & T van that contained a projectile. Mr. Troxler also recovered a projectile lodged into the upper story of a vacant residence located directly across Highway 90 from defendant's truck. On the following day, Technician Anthony Wetta discovered one projectile in the driver's side of Corporal Hazeltine's unit.[13]
Jeff Goudeau with the Louisiana State Police Crime Lab, an accepted expert in shooting reconstruction and crime scene investigation, examined the windshield of defendant's 2013 Chevrolet Silverado. Through his assessment of the radial fractures and coning effects[14] of the bullet strikes in the windshield, Mr. Goudeau was able to ascertain the sequence of the bullets *243 and whether they entered or exited the windshield. In his opinion, the first bullet fired entered from the outside of the windshield and travelled inside the vehicle, and the remaining six bullet strikes were shot from inside the vehicle and traveled out. Mr. Goudeau examined Corporal Hazeltine's unit and determined that based upon the manner in which a Glock 9-mm ejects its casings, those bullets entered the unit from the outside.
Michelle Cazes with the Louisiana State Police Crime Lab firearms section,[15] and an expert in the field of firearms examination and analysis, compared the firearms, bullet cartridges, and the bullets collected from the scene. After review of the evidence, Ms. Cazes determined that the six bullet cartridges collected from the center console of defendant's truck were fired from the 357 Smith & Wesson revolver. She testified that there were fourteen bullet cartridges and seven damaged brass jacket bullets found which were fired from defendant's Glock 9-mm. She determined that the brass jacketed bullet collected from the AT & T van, as well as the brass jacketed bullet collected from the vacant house across the street, were fired from defendant's Glock 9-mm. Ms. Cazes was able to determine that at least seven shots were fired from Corporal Hazeltine's 40 caliber Glock. There were three projectiles found that could have been fired from the 40 caliber Glock, but she could not definitively state whether they were or were not.[16] It was determined that no shots were fired from the loaded 40 Smith & Wesson semi-automatic found in the brown fanny pack in the center console of defendant's truck.
At trial, Corporal Hazeltine testified that he had scars on his arms and chest from the incident and was blind in his left eye, which required a lot of adjustment due to the lack of depth perception and peripheral vision that resulted. Corporal Hazeltine could no longer work traffic duty due to his lack of peripheral vision, as that is necessary to spot oncoming traffic and to remain aware of his surroundings. At the time of trial, Corporal Hazeltine worked in the Sheriff's Office training academy as a training officer.
Several passersby observed the incident and provided their accounts at trial of what transpired. While in route to bring his daughter to school, Armand A. Troulliet, Jr. observed in his mirror a truck close behind him with the flashers on and the driver[17] of the truck motioning to him. Eventually, the driver moved to the side of Mr. Troulliet's vehicle and began to flash a badge at him. After the truck moved ahead of him and both vehicles were stopped in the turning lane, Mr. Troulliet observed the driver waving, blowing his horn, making erratic hand gestures, and trying to get the attention of the officer parked adjacent to Highway 90 who routinely directed morning bus traffic. Mr. Troulliet described that once the traffic cleared, the driver erratically took off in such a way that his tires screeched as he turned into the Timesaver. Mr. Troulliet recognized the driver's truck on social media and on the news following the incident with Corporal Hazeltine.
*244 As he slowed down near the school zone, Cary Morrell, another witness, also noticed a truck in the turning lane. The driver was blowing his horn and flailing his hands.
Louis Dufrene testified that he was headed westbound on Highway 90 from Boutte to Des Allemands when he observed the confrontation. Mr. Dufrene testified that he saw the police officer approach the truck with his gun drawn and noticed the driver of the truck's hand between the mirror of the truck and the window frame when he began to first shoot at the officer with the hand hanging out of the window. He recounted that the officer dove to the ground and then shot into the windshield of the truck. Mr. Dufrene parked his truck on the shoulder of Highway 90, exited his vehicle, and attempted to distract the driver "so the police officer could get a shot on him, but he was just had [sic] his mind set on that police officer." He maintained that the driver continued to shoot at the officer even after hitting him three times and after the officer crawled back towards his unit.
Janice K. Candella, who drives school bus number 125 for St. Charles Parish, provided that at approximately 8:45 a.m. to 8:50 a.m. that morning, she was at a stop sign on Louisiana Street waiting to turn onto Highway 90 when she noticed Corporal Hazeltine[18] with his gun drawn walking towards a silver truck. She then observed that the person sitting in the truck was holding a gun out of the window. Ms. Candella was unable to hear what was being said. As she was calling for backup, Ms. Candella heard the shots start and saw Corporal Hazeltine fall and then crawl to his unit. She provided that both the driver and Corporal Hazeltine were shooting at each other.
Kecia Henchman was driving school bus number 54 that morning when she heard bus 125 call for assistance for an officer. Ms. Henchman looked in the direction Corporal Hazeltine normally stood and noticed he was standing off to the side of a gray truck with his gun drawn; she could see that he was yelling at the driver of the truck. Ms. Henchman provided that at first, defendant's hand was out of the window and laid against the mirror. She could not see what was in his hand. Ms. Henchman watched as the shots began, and the windshield of the truck shattered as Corporal Hazeltine stumbled backwards. She observed that Corporal Hazeltine fell to the ground and tried to move back towards his unit as the driver "stood up out of the truck" with a gun, between the door and the side of the truck, while continuing to shoot across the door at Corporal Hazeltine who was on the ground. Ms. Henchman estimated that the driver of the truck shot around a dozen times, but it was "just so much it's hard to count."
Thomas Y. Joseph, the custodian at J.B. Martin Middle School, was at the stop sign on Louisiana Street at Highway 90 during this incident. Mr. Joseph pulled his vehicle over and watched as Corporal Hazeltine was talking to the driver as he went to the door of the driver's truck. He then jumped back, grabbed his weapon, and continued talking to the driver. Mr. Joseph testified that Corporal Hazeltine started backing up with his gun pointed at the driver and that he began to fire his weapon when the driver "went down in the truck." He provided that the driver then "came out of the side window with his weapon, and pow, pow, pow." Mr. Joseph provided that the *245 driver continued to shoot after Corporal Hazeltine was shot the first time.
Cindy L. Breaux was stopped at a stop sign about one block from the Timesaver that morning. As she looked around before proceeding onto the highway, she observed a deputy walking around the front of his unit, and she heard gunshots. Panicked, she exited her truck and hid behind it. She observed someone drag the deputy around his unit out of the line of fire, and officers arrived and attempted to pull someone out of the truck. Ms. Breaux confirmed in her statement given to the police following the incident that she reported the first thing that she saw was Corporal Hazeltine approach with his weapon and then heard "pow-pow-pow-pow." Ms. Breaux provided that it was her impression that the deputy shot first, and she thought she heard shots after he fell to the ground. She admitted that she could not see inside the truck from her position, so she could not know what the driver of the truck was doing.
Willie Wayne King, the driver of the AT & T van from which a projectile was recovered, was on Highway 90 when he heard what sounded like firecrackers and noticed that a police officer was on the ground in front of his unit reaching for what appeared to be his weapon. As he was directly in front of the scene, Mr. King observed that the door of a truck was open, and the driver was standing on the "door jamb" of the truck with "[b]oth arms out between the door by the windshield." The driver was "just shooting, shooting, shooting." Mr. King's AT & T van was located across the four lanes of traffic from defendant's vehicle and was struck as it passed the scene.
In light of defendant's dual plea of not guilty and not guilty by reason of insanity, the defense presented the testimony of three expert witnesses as to defendant's sanity at the time of the gunfight. First, Dr. Richard Richoux, an expert in the field of forensic psychology and a member of the appointed sanity commission, evaluated defendant on May 12, 2015 for competency, and on November 3, 2015 as to whether he was legally sane at the time of the offense. Dr. Richoux reviewed defendant's employment history, education background, a summary of past medical records, police reports, transcripts of interviews with parties with knowledge of defendant, and the report of Dr. Daphne Glindmeyer. Dr. Richoux noted defendant's reported history of depression, post-traumatic stress disorder ("PTSD"), and prescription of Neurontin, which he described had mood stabilizing effects in certain individuals. He also noted defendant's position as a Navy military policeman for nine years and his position with the Transportation Security Administration ("TSA") for a period of time.
Dr. Richoux testified that at the May 12, 2015 competency evaluation, he did not perceive that defendant manifested a clinical level of depression, nor did he view defendant as being psychotic or abnormal in his thought processes. However, on November 3, 2015, Dr. Richoux found that defendant suffered from an unspecified psychotic[19] disorder on the date of the offense due to a combination of prescription drugs, which manifested through symptoms of paranoia and grandiose delusions.
Dr. Richoux testified that there was a "buildup" of events that occurred near the date of the offense that led to defendant's behavior on the day of the shooting. Dr. *246 Richoux detailed that the week prior to the incident, defendant was residing in a hotel in Gulfport and told the hotel proprietor that "something big" was about to occur in his life and insisted that no one access his room or a box in his room he said contained something very important. After leaving Gulfport, defendant attended a wedding and reception where the wedding guests, several of whom were his relatives, reported that defendant was behaving oddly, was suspicious of others, and was alluding to being a federal law enforcement agent. Dr. Richoux recounted that after the wedding, defendant drank energy drinks, took stimulants and narcotic analgesics, and drove all night to St. Charles Parish to attend the funeral of another relative.
Dr. Richoux opined that while in that frame of mind, defendant's interaction with an individual with a weapon may have triggered defendant's paranoia to escalate, and he may have thought firing a weapon was an appropriate response. After discussing the concepts of legal sanity and of paranoia, Dr. Richoux concluded that defendant was legally insane at the time of the offense.
Dr. Rafael Salcedo, an expert in forensic psychology and the second member of the appointed sanity commission, testified that at the May 12, 2015 competency evaluation, defendant did not exhibit any overt symptoms of psychosis, depression, PTSD, or any other mental disorder. At that time, defendant had ceased taking the prescribed pain, anti-anxiety, and psychostimulant medications and had ceased receiving the steroid injections for spinal problems.
Like Dr. Richoux, Dr. Salcedo evaluated defendant's sanity at the time of the offense on November 3, 2015, and found that defendant suffered a psychotic disorder on the date of the offense. More specifically, Dr. Salcedo believed that defendant was suffering from substance induced delusional grandiosity and paranoia which resulted from the combination of medication, sleep deprivation, and a low grade level of paranoia; this impaired defendant's ability to distinguish right from wrong. Dr. Salcedo believed that defendant thought he was lawfully acting in self-defense.
Dr. Salcedo noted defendant's past problematic behavior, resulting in multiple divorces and an incident of domestic violence. He referenced defendant's statement to the hotel proprietor that no one should enter his room without his permission and "something big was about to happen," which he believed indicated defendant's increasing paranoia shortly before the date of the incident.
Last, Dr. Daphne Glindmeyer, an expert in the field of psychiatry and forensic psychiatry, testified for the defense that when she conducted a mental status evaluation of defendant on May 15, 2015, defendant exhibited strong symptoms of grandiosity and paranoia, and it was her opinion that defendant had a delusional disorder. In her meeting with defendant, defendant believed that he was a very important undercover officer of the law, started the TSA, owned St. Charles Parish, and was involved in a sting operation with the Gulfport police. Dr. Glindmeyer asserted that defendant also suffered from this delusional disorder at the time of the shooting, which impacted his ability to distinguish right from wrong at that time, and that having a gun pointed at him could have made him more paranoid and delusional. In her study of defendant, Dr. Glindmeyer learned that he was prescribed Neurontin, Oxycontin, and a Lidocaine patch for pain, as well as the psychotropic medications[20] *247 of extended release Effexor, Seroquel, Provigil, and Valium. She testified that defendant took the medications as prescribed.
To further form her opinion, Dr. Glindmeyer reviewed defendant's medical history and learned that he saw a psychotherapist, Dr. Susan Niemann Hightower, from 2012 to 2014, and Dr. Hightower relayed that defendant had been progressively deteriorating over time. Dr. Hightower had diagnosed defendant with moderate depression. Dr. Glindmeyer also learned that defendant saw a psychiatric nurse practitioner, Ralph Barrows, but was unable to reach him. She also spoke with "Dr. Lou," a pain management doctor who gave defendant an epidural steroid injection the week before the shooting. She also spoke to several of defendant's siblings, defendant's father, and a friend.
Dr. Glindmeyer believed that defendant was exposed to significant stressors the week before the incident, such as contact with relatives at the wedding and the funeral, the steroid epidural injection, and lack of sleep, which exacerbated his illness and created "a perfect storm" for his delusional disorder to manifest on the date of the offense. She denied that defendant suffered from a major depressive disorder or from an opiate overuse disorder at the time of the shooting.
In rebuttal, the State called Dr. John W. Thompson, Jr., the chairman of the Department of Psychiatry at Tulane University who also works at the state mental hospital in Jackson, Louisiana. Dr. Thompson was accepted as an expert in the field of forensic and addiction psychiatry. Dr. Thompson conducted competency and sanity evaluations of defendant on September 28, 2016, some twenty months after the incident, and reviewed the records in this case. He also spoke with defendant's father, who came along with defendant to the interview.
In Dr. Thompson's meeting with defendant, defendant reported his past history of psychiatric treatment and medications for depression and pain symptoms. Dr. Thompson obtained defendant's Navy records and noted that defendant's twenty-year military record was devoid of any psychiatric issues. In his medical opinion, Dr. Thompson asserted that defendant's actions were more characteristic of his personality, rather than a major psychiatric condition. He did not believe that defendant exhibited any symptoms of a delusional disorder.
It was Dr. Thompson's opinion that defendant believed he was in a confrontational situation where he was forced to defend himself. Dr. Thompson asserted that defendant's ideation of being a police officer was not a delusion, but rather, defendant believed he was a law enforcement officer as part of his identity. In reviewing the OnStar and 9-1-1 calls placed by defendant, wherein defendant asserted that he "owned" the parish and believed that the Sheriff would come to the scene, Dr. Thompson opined that defendant suffered the effects of a lack of sleep, the prescribed medications, and irritation. Dr. Thompson described it as "distorted thinking." Dr. Thompson administered the Minnesota Multiphasic Personality Inventory ("MMPI") test, an objective personality test, to defendant and compared the results thereof to persons with similar demographic characteristics. The results yielded from the MMPI did not indicate that defendant suffered from paranoia, nor were they consistent with a delusional disorder or any active signs of PTSD.[21]
*248 Dr. Thompson's final diagnosis of defendant at the time of the offense was major depressive disorder, as well as an opiate pain use disorder, neither of which included psychotic features. He disagreed with Drs. Glindmeyer, Richoux, and Salcedo's opinions that defendant suffered from a psychotic delusional disorder, as "[a] delusional disorder doesn't really go away" and is very hard to treat. Contrary to the other doctors' opinions, Dr. Thompson did not believe that defendant was taking his medications as prescribed. As to defendant's personality traits, Dr. Thompson provided that defendant had a difficult time with authority, and defendant showed obsessive compulsive, anti-social, and narcissistic personality traits, or Cluster B personality traits. He provided that these personality traits as well as the prior stressors resulted in the shooting. Dr. Thompson concluded that defendant was sane at the time of the offense.
ASSIGNMENTS OF ERROR
1. The trial court erred in denying defendant's motion for post-verdict judgment of acquittal because no rational jury could have reasonably found defendant guilty beyond a reasonable doubt of: (1) the essential elements of attempted first degree murder because he lacked the necessary specific intent to kill Corporal Hazeltine and the evidence at best only supports a verdict of attempted manslaughter; (2) attempted first degree murder because he proved that he was acting in self-defense at the time of the charged crime; and (3) attempted first degree murder because he proved that he was suffering from an involuntary drugged condition, which was produced by a combination of psychotropic drugs prescribed to him by his treating doctors, under circumstances which indicate that his drugged condition was the direct cause of his commission of the charged crime because it caused him to suffer from a delusional disorder, which produced symptoms of paranoia and grandiose delusions, that impaired his ability to distinguish between right and wrong at the time of the charged crime.
2. The trial court erred in instructing the jury that it could infer that defendant intended the natural and probable consequences of his acts, even in the absence of a contemporaneous objection by defense counsel, because this erroneous instruction affected defendant's substantial rights by affirmatively shifting the burden of proof and/or burden of persuasion to him on the disputed and critical fact of whether he had the necessary specific intent to kill at the time of the offense by creating either a conclusive or nonconclusive presumption of specific intent to kill that remained in place until it was overcome or destroyed by evidence introduced by defendant to prove that he was acting in self-defense.
3. The trial court erred by including language in its jury instruction on attempt, over defense counsel's timely objection, regarding lying in wait with a dangerous weapon and searching for the intended victim with a dangerous weapon with the intent to commit a crime, because the evidence introduced at trial did not support including the objectionable language and it was likely to confuse the jury by causing them to erroneously conclude that defendant's mere presence at the scene, or his return to the scene to speak *249 to Corporal Hazeltine, was sufficient to convict him of the offense of attempt.
4. The trial court erred by denying defendant's motion for a new trial because, due to insufficient evidence, the verdict is contrary to the law and the evidence as a matter of law, and the ends of justice would be served by granting him a new trial although he may not be entitled to one as a matter of right.
5. The trial court erred by granting the State's Code of Evidence Article 404(B) notice of intent to use evidence of other bad acts and allowing five law enforcement officers from Gulfport, Mississippi, to testify regarding other crimes evidence unrelated to the charge of attempted first degree murder.
6. The trial court erred by denying defendant's motion to reconsider his sentence because it is contrary to the sentencing guidelines, constitutionally excessive, and lacks proportionality.
ASSIGNMENTS OF ERROR NUMBERS ONE AND FOUR
Sufficiency of the evidence
Defendant first assigns as error the sufficiency of the evidence used to convict him of attempted first-degree murder of a police officer. His fourth assignment of error includes the argument that the trial court erred in denying his motion for a new trial as it was contrary to the law and the evidence.[22]
Defendant filed a motion for a new trial and a motion for post-verdict judgment of acquittal in the trial court challenging the sufficiency of the evidence. The motion for a new trial is based on the supposition that injustice has been done to the defendant, and unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851(A). The decision on a motion for a new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Mouton , 16-673 (La. App. 5 Cir. 4/26/17), 219 So.3d 1244, 1254, writ denied , 17-1149 (La. 5/18/18), 242 So.3d 572 ; State v. Delagardelle , 06-898 (La. App. 5 Cir. 4/11/07), 957 So.2d 825, 829, writ denied , 07-1067 (La. 11/21/07), 967 So.2d 1154.
On motion of the defendant, the court shall grant a new trial whenever the verdict is contrary to the law and the evidence. La. C.Cr.P. art. 851(B)(1). When a motion for a new trial is based on the verdict being contrary to the law and the evidence, there is nothing for review on appeal. Mouton , supra ; State v. Condley , 04-1349 (La. App. 5 Cir. 5/31/05), 904 So.2d 881, 888, writ denied , 05-1760 (La. 2/10/06), 924 So.2d 163. However, both the Louisiana Supreme Court and this Court have addressed the constitutional issue of the sufficiency of the evidence under this circumstance. Id. Further, the question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. Mouton , supra ;
*250 State v. Bazley , 09-358 (La. App. 5 Cir. 1/11/11), 60 So.3d 7, 18, writ denied , 11-282 (La. 6/17/11), 63 So.3d 1039. Therefore, this Court can address on review the denial of defendant's motion for a new trial based on sufficiency of the evidence.
During argument at the hearing on the motions for a new trial and for post-verdict judgment of acquittal, defendant argued that the evidence presented at trial clearly showed that defendant was in the middle of a psychotic event, the State did not prove that defendant had the specific intent to kill Corporal Hazeltine, and that he acted in self-defense. The State responded that the jury heard the testimony of the experts and the witnesses and concluded that defendant was guilty of attempted first degree murder. The trial judge denied the motions.
In these assignments, defendant argues that his conviction is not supported by the evidence and that the trial court erred in denying his motions for post-verdict judgment of acquittal and for a new trial. His three theories in support of his position are: 1) the evidence was insufficient to prove he had the specific intent to kill Corporal Hazeltine; 2) no rational jury could have found defendant guilty because he proved he was acting in self-defense; and 3) no rational jury could have found that he did not prove beyond a preponderance of the evidence that he was insane at the time of the offense.
Specific intent
Defendant specifically argues that no rational jury could have reasonably determined that the State proved beyond a reasonable doubt that he had the required specific intent to kill Corporal Hazeltine. He argues that he fired his weapons only in response to the seven or eight shots fired by Corporal Hazeltine. He further asserts that he justifiably acted in self-defense under La. R.S. 14:19 to prevent his own death or serious bodily injury since at the time Corporal Hazeltine approached, there was no probable cause for his arrest or detention, and Corporal Hazeltine's actions were sufficient to deprive the average person, much less a delusional one such as himself, to take action in sudden passion or heat of blood. He contends that Corporal Hazeltine drew his weapon and approached defendant first while defendant was in a lawful place and had not committed any crime, as he lawfully possessed his weapons, a constitutional right. He argues that he was not the aggressor, but rather Corporal Hazeltine was. He reasonably believed he was in danger of losing his life from Corporal Hazeltine and used reasonable and necessary force to defend himself.
The State responds that the evidence presented indicated to the contrary that defendant had the specific intent to kill Corporal Hazeltine, as demonstrated by the multiple weapons used by defendant and the injuries sustained by Corporal Hazeltine. It contends that defendant's arguments regarding the lawfulness of defendant's position at the time of the shooting and of the lawfulness of the possession of his weapons are meaningless as to whether defendant had specific intent to kill. The State counters that defendant's actions were anything but reasonable as he continually chose to escalate the situation.
The constitutional standard for testing sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable *251 doubt. State v. Trim , 12-115 (La. App. 5 Cir. 10/16/12), 107 So.3d 656, 659, writ denied , 12-2488 (La. 4/19/13), 111 So.3d 1030 ; State v. Jones , 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier-of-fact would have found guilt beyond a reasonable doubt. Id.
Evidence may be either direct or circumstantial. Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton , 01-572 (La. App. 5 Cir. 12/12/01), 806 So.2d 718, 722. The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. However, this requirement does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. State v. Lathers , 03-941 (La. App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id.
When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey , 04-85 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied , 04-1605 (La. 11/15/04), 887 So.2d 476, cert. denied , 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier-of-fact, is sufficient to convict. State v. Addison , 00-1730 (La. App. 5 Cir. 5/16/01), 788 So.2d 608, 613, writ denied , 01-1660 (La. 4/26/02), 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Bailey , supra .
In the present matter, defendant was convicted of attempted first degree murder of a peace officer, Corporal Hazeltine, in violation of La. R.S. 14:27 and La. R.S. 14:30. According to La. R.S. 14:30(A)(2), first degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm upon a peace officer.[23] Attempt is defined as "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended." La. R.S. 14:27(A).
The crime of attempted murder, whether first or second degree, requires proof of the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Girod , 94-853 (La. App. 5 Cir. 3/15/95), 653 So.2d 664, 668. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The specific criminal intent required does not have to be proven as fact, but may be inferred from the circumstances and actions of the defendant. Girod , supra.
*252 Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight , 09-359 (La. App. 5 Cir. 2/9/10), 34 So.3d 307, 317, writ denied , 10-2444 (La. 10/21/11), 73 So.3d 376. Specific intent may be inferred from the act of pointing a gun and firing it at a person. State v. Alsay , 11-562 (La. App. 5 Cir. 12/13/11), 81 So.3d 145, 149, writ denied , 12-1041 (La. 9/21/12), 98 So.3d 335 ; State v. Gonzalez , 07-449 (La. App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied , 08-0228 (La. 9/19/08), 992 So.2d 949. Specific intent to kill may be inferred from the extent and severity of the victim's injuries. State v. Deweese , 13-293 (La. App. 5 Cir. 10/30/13), 128 So.3d 1186, 1192. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. Id.
Upon review, we find that the record demonstrates that the evidence was sufficient to convict defendant of the attempted first degree murder of Corporal Hazeltine. The evidence introduced at trial established that defendant pointed and fired his 9-mm Glock and his 357 Smith & Wesson revolver at Corporal Hazeltine multiple times while he was engaged in the performance of his lawful duty as a peace officer. It is well established that specific intent may be inferred from the act of pointing a gun and firing it at a person. See Alsay , supra . Moreover, Corporal Hazeltine was shot by defendant in the arm and the eye, which left him with permanent blindness in that eye. Defendant also shot Corporal Hazeltine in the chest area.[24]
In addition, the physical evidence at the scene demonstrates that defendant continued to fire at Corporal Hazeltine even after Corporal Hazeltine was disarmed, injured, and attempting to retreat behind the cover of his unit, which we find is further indicative of defendant's intent to kill Corporal Hazeltine. Over twenty bullet casings and projectiles were removed from the areas around the vehicles, including from a vacant house across the street and an AT & T van which was driving past the scene and across the highway. An empty magazine for the Glock was found on the floorboard of defendant's truck, and a third loaded weapon was found in a fanny pack in defendant's console. The physical evidence substantiated the eyewitnesses' testimony that numerous shots were fired by defendant, even after Corporal Hazeltine attempted to crawl back to his unit. Further, Ms. Henchman indicated that after Corporal Hazeltine was shot, defendant positioned himself between the door and side of the truck while continuing to shoot. Mr. King's testimony indicated that after Corporal Hazeltine was shot, defendant was standing on the "door jamb" of the truck with "both arms out between the door by the windshield," and defendant was "just shooting, shooting, shooting." Therefore, we find that the State presented sufficient evidence of defendant's specific intent to kill Corporal Hazeltine, a peace officer engaged in the performance of his lawful duty, to sustain his conviction for attempted first degree murder of a peace officer.
Self-defense
On appeal, defendant also argues that his actions were in self-defense, and that he was not the aggressor. At trial, defendant also argued that his actions were in self-defense, and the jury was instructed before deliberations regarding *253 defendant's theory of self-defense and the aggressor doctrine. This Court has held that it is a defendant's burden in a non-homicide case to prove by a preponderance of the evidence that his actions were in self-defense. State v. Howard , 15-473 (La. App. 5 Cir. 12/9/15), 182 So.3d 360, 363 ; State v. Baham , 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 567, writ denied , 15-0740 (La. 3/24/16), 190 So.3d 1189.[25] The assertion of self-defense in a non-homicide situation requires a dual inquiry: an objective inquiry into whether the force used was reasonable under the circumstances and a subjective inquiry into whether the force was apparently necessary. State v. Nailor , 10-1062 (La. App. 5 Cir. 11/15/11), 78 So.3d 816, 822, writ denied , 11-2780 (La. 4/27/12), 86 So.3d 626. The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18 ; State v. Sparkman , 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 106, writ denied , 14-0477 (La. 11/26/14), 152 So.3d 897.
La. R.S. 14:21 provides: "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict." While there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Sparkman , supra , 136 So.3d at 107 ; State v. King , 11-767 (La. App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, writ denied , 12-660 (La. 9/14/12), 99 So.3d 35.
*254 The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. Baham , supra , 169 So.3d at 567. The jury is the ultimate fact-finder in determining whether a defendant proved his condition. Id.
Upon review, we find that defendant failed to establish by a preponderance of the evidence that he acted in self-defense. At trial, defendant's version of events, wherein he claimed he acted in self-defense on the day of the shooting, was presented to the jury as it was demonstrated that Corporal Hazeltine pointed and fired his weapon at defendant first. Expert testimony showed that the first bullet striking the windshield entered from the outside and traveled in, thus establishing that Corporal Hazeltine shot first into defendant's windshield. Corporal Hazeltine admitted that he drew his service weapon upon seeing the weapon laying on defendant's dashboard. Also, the jury heard defendant's statement wherein he indicated that he was sorry for shooting Corporal Hazeltine, but that Corporal Hazeltine made defendant shoot him.
The State, however, presented evidence of a different version of the events of that day to rebut defendant's claim of self-defense. Corporal Hazeltine testified that defendant returned to the scene after being irate earlier, at which time a firearm was placed on defendant's dashboard. Further, after being ordered to put his hands up, defendant hung a weapon out of the window. Rather than obeying Corporal Hazeltine's commands, defendant chose to escalate the situation, when Corporal Hazeltine observed "the barrel of a gun coming up over the dashboard pointed at [him]." The testimony of the eyewitness, who observed defendant continually shoot at Corporal Hazeltine after he dropped his service weapon, supported the State's position that defendant was not acting in self-defense.
We find that Corporal Hazeltine's action of pointing his weapon at defendant first does not necessitate a finding that defendant was acting in self-defense. Further, the accounts of the State's eyewitnesses, despite their testimony that Corporal Hazeltine yelled at defendant and pointed and fired his weapon at defendant, corroborate Corporal Hazeltine's version of what occurred and that defendant was not acting in self-defense. Therefore, we find that defendant's actions of failing to comply with Corporal Hazeltine's order, and instead holding another weapon out of the window, indicate that defendant did not feel his life was in imminent danger. See Baham , supra .
Additionally, the shooting occurred when defendant returned to where Corporal Hazeltine was directing traffic, after he had previously been irate there. As such, we find that defendant cannot claim that he withdrew from the conflict in good faith under the aggressor doctrine or that the force used at that time was necessary to prevent any danger to defendant. At no time did the testimony at trial indicate that Corporal Hazeltine approached defendant upon his return with the intent to arrest or detain him. Rather, Corporal Hazeltine approached to have a conversation with defendant, remembering that he had been upset. Therefore, the legality of defendant's location and the lawfulness of the possession of his firearms have no bearing on whether defendant acted in self-defense.
After hearing the testimony, the jury obviously believed the State's witnesses and rejected defendant's claim that he shot Corporal Hazeltine in self-defense. Again, *255 the credibility of witnesses is within the sound discretion of the trier-of-fact, who may accept or reject, in whole or in part, the testimony of any witness, and the credibility of witnesses will not be reweighed on appeal. See Bailey , supra .
Responsive verdicts of attempted manslaughter and attempted aggravated battery
Defendant further argues that the evidence was only sufficient to support a verdict of attempted manslaughter or attempted aggravated battery. La. C.Cr.P. art. 814(A)(2) includes both attempted manslaughter and attempted aggravated battery as legislatively authorized responsive verdicts to attempted first degree murder, and the definitions of these responsive verdicts were provided to the jury for their consideration.
Aggravated battery is defined as the intentional use of force or violence upon the person of another committed with a dangerous weapon. La. R.S. 14:33 ; La. R.S. 14:34 ; State v. Austin , 04-993 (La. App. 5 Cir. 3/1/05), 900 So.2d 867, 877, writ denied , 05-0830 (La. 11/28/05), 916 So.2d 143.
Manslaughter is defined as a homicide that would be a first or second degree murder, except that "the offense is committed in a sudden passion or heat of blood immediately caused by a provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31(A)(1). Although specific intent to kill is not necessary for a conviction of manslaughter, a specific intent to kill is required for a conviction of attempted manslaughter. State v. Ducksworth , 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225, 231. To support a conviction for attempted manslaughter, the State must prove beyond a reasonable doubt that the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal. Id.
In order to be entitled to the lesser verdict of attempted manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. State v. Riley , 11-673 (La. App. 5 Cir. 3/13/12), 90 So.3d 1144, 1150-51, writ denied , 12-0855 (La. 9/28/12), 98 So.3d 828. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. State v. Thompson , 14-764 (La. App. 5 Cir. 1/28/15), 167 So.3d 884, 889-90 ; State v. Bauman , 08-1169 (La. App. 5 Cir. 5/12/09), 15 So.3d 177, 185, writ denied , 09-1533 (La. 4/23/10), 34 So.3d 300. Provocation and time for cooling are questions for the jury to determine under the standard of an average or ordinary person, one with ordinary self-control. State v. Deal , 00-434 (La. 11/28/01), 802 So.2d 1254, 1260, cert. denied , 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. State v. Patterson , 10-415 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 150, writ denied , 11-0338 (La. 6/17/11), 63 So.3d 1037. The question for this Court on review is whether a rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Bauman , supra .
Defendant argues that Corporal Hazeltine's action of pointing his weapon at defendant triggered defendant's paranoia and caused him to react in a violent way in which he perceived to be self-defense. He contends that Corporal Hazeltine used an *256 excessive amount of force sufficient to deprive an average person of his self-control and cool reflection. The State responds that the jury concluded that defendant was the provoker and was not eligible for the verdict of attempted manslaughter.
Upon review, we find that defendant's claim that he was provoked by Corporal Hazeltine's act of drawing his weapon was not sufficient to deprive an average person of his self-control and cool reflection. The testimony indicated that Corporal Hazeltine drew his weapon in response to observing a firearm in view on defendant's dashboard and defendant's behavior during Corporal Hazeltine's first encounter with him. Defendant did not respond immediately to the alleged "provocation" of Corporal Hazeltine pointing a gun at him, but rather, hung a firearm out of the window for Corporal Hazeltine to see. As evidenced by the verdict, the jury determined that defendant acted more than just with intentional use of force or violence required for a conviction of the responsive verdict of aggravated battery, but rather had the requisite specific intent to kill. As previously discussed, we find that the evidence presented by the State was sufficient to sustain defendant's conviction of attempted first degree murder, rather than only the responsive verdicts of attempted manslaughter or attempted battery. To the extent that defendant argues that he did not have ordinary self-control due to his mental state at the time of the offense, we find that defendant was legally sane at the time of the offense, as hereinafter set forth.
Insanity at the time of the offense
Defendant asserts that no rational jury could have found him guilty based on the evidence as he proved by a preponderance of the evidence that he was insane at the time of the offense. He argues he was clearly psychotic at the time of the shooting as a result of a combination of psychotropic medications that impaired his ability to distinguish between right and wrong. Defendant relies upon three of the four mental health experts' opinions who concluded that he was legally insane at the time of the offense. He also argues that instead of hiding evidence or leaving the scene, he remained in his truck as deputies arrived, which supports that he was unable to distinguish right from wrong at the time of the offense. The State responds that Dr. Thompson's expert testimony establishes that the jury was justified in concluding that defendant failed to prove by a preponderance of the evidence that he was legally insane at the time of the offense.
Defendant changed his initial plea of "not guilty" to the plea of "not guilty and not guilty by reason of insanity." Further, the jury was instructed of defendant's dual plea and defendant's burden of proving his insanity at the time of the offense by a preponderance of the evidence. However, the jury rejected defendant's insanity defense and found him guilty as charged.
In Louisiana, the law presumes a criminal defendant is sane. State v. Milton , 13-672 (La. App. 5 Cir. 5/14/14), 142 So.3d 157, 165 ; State v. Abbott , 11-1162 (La. App. 5 Cir. 5/31/12), 97 So.3d 1066, 1068-69. To rebut this presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. Id. This burden is not borne by proving the mere existence of a mental disease or defect. Rather, to be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question. Id. The determination of sanity is a factual matter. Id. In considering an accused's plea of not *257 guilty and not guilty by reason of insanity, the trier-of-fact must first determine whether the State has proven the essential elements of the charged offense beyond a reasonable doubt. Id. The trier-of-fact may then proceed to the determination of whether the defendant was incapable of distinguishing between right and wrong at the time of the offense. Id.
All evidence, including both expert and lay testimony, along with the defendant's conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof. State v. Williams , 10-1010 (La. App. 5 Cir. 9/27/11), 76 So.3d 90, 96. Expert testimony is relevant to the issue of whether a defendant is insane; but, even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Sepulvado , 26,948 (La. App. 2 Cir. 5/10/95), 655 So.2d 623, 628, writ denied , 95-1437 (La. 11/13/95), 662 So.2d 465. On review of a claim for sufficiency of the evidence in an action where an insanity defense has been raised, the appellate court, applying the standard outlined in Jackson v. Virginia , supra , must determine whether under the facts and circumstances of the case, any rational fact-finder, viewing the evidence in a light most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Abbott , supra .
In the present case, expert witnesses disagreed as to defendant's sanity. In support of his insanity defense, defendant offered the expert testimony of Drs. Richoux, Salcedo, and Glindmeyer. Both Drs. Richoux and Salcedo, members of the appointed sanity commission, first evaluated defendant for competency to proceed and found no psychotic abnormalities present. However, upon subsequent evaluation of defendant for sanity at the time of the offense, Dr. Richoux found that defendant suffered from an unspecified psychotic disorder on the date of the shooting due to a combination of prescription medications that rendered him incapable of distinguishing between right and wrong. Dr. Richoux testified to a "build up" of events occurring around a week prior to the shooting, including that defendant was living in a hotel room in Gulfport, Mississippi, and believed "something big" was about to occur, attended a wedding with relatives who reported that he was behaving oddly, and then drove overnight to St. Charles Parish to attend a relative's funeral after drinking and taking stimulants and narcotic analgesics. Similarly, Dr. Salcedo opined that on the date of the shooting, defendant suffered from a psychotic disorder that impaired his ability to distinguish between right and wrong. Both Drs. Richoux and Salcedo opined that defendant suffered from paranoia and grandiose delusions and believed he was acting in self-defense after Corporal Hazeltine drew his weapon and pointed it at him.
Dr. Glindmeyer, an appointed independent health examiner obtained by the defense, opined that defendant exhibited symptoms of grandiosity and paranoia during her interview and was suffering from a delusional disorder at the time of the offense. She detailed defendant's delusions as his beliefs that he started the TSA, was a federal law enforcement officer, and owned St. Charles Parish. Dr. Glindmeyer spoke with some of defendant's past medical professionals, including his psychotherapist, who diagnosed defendant with moderate depression, and his pain management doctor who had injected defendant with a spinal steroid injection close in time to the date of the offense. Her theory was that the events leading up to the shooting had created a "perfect *258 storm" for defendant's delusional disorder to manifest. Therefore, all three of the defense's experts testified to the jury that defendant was incapable of distinguishing between right and wrong at the time of the offense.
Conversely, Dr. Thompson, the State's expert, believed that defendant's actions on the day of the shooting were a combination of his personality traits and the prior stressful events. He did not believe defendant suffered from a delusional disorder, but rather a depressive disorder. He asserted that defendant's belief that he was a federal law enforcement officer was not a delusion, but a part of defendant's identity given his military history; defendant suffered only from a lack of sleep, the effects of prescription medications, and irritability. Dr. Thompson believed that defendant had a confrontational nature, problems with authority, and a strong belief in his constitutional right to bear arms. Dr. Thompson conducted an objective personality test on defendant, which yielded the presence of the personality traits of anti-socialism, narcissism, difficulty with authority, and obsessive compulsion. Also contrary to the other doctors' opinions, Dr. Thompson did not believe that defendant was taking his medications as prescribed.
Upon review, as alluded to by Dr. Thompson, we find that defendant's actions prior to and at the time of the shooting support the jury's determination that defendant was not insane at the time of the offense. On the day of the shooting, defendant indicated in a call that he was sorry he had to shoot Corporal Hazeltine, which Dr. Thompson believed was an appropriate response by defendant based on his background and training. As to his statement that he "owned the parish" or that the Sheriff would come to his assistance, Dr. Thompson asserted that these were not delusions since defendant had lived in St. Charles Parish before and knew the Sheriff from playing in the band with him in high school.
Further, after initially approaching the scene and believing that Corporal Hazeltine was doing a poor job of directing traffic, defendant left the area and attempted to contact the Sheriff to complain. Defendant then decided to return to the scene to speak with Corporal Hazeltine himself. At the time he returned and Corporal Hazeltine approached defendant's truck, defendant had one weapon placed on his dashboard within Corporal Hazeltine's sight, which led Corporal Hazeltine to draw his weapon. In State v. Milton , supra , 142 So.3d at 167-68, this Court found that the defendant's actions during and after a shooting did not support a finding of insanity, as the evidence adduced at trial established that the defendant initially appeared on the scene angry, yelling, and threatening the victim and his friends while armed, but left the scene without resorting to violence. Yet, when he returned to the scene, he carried out his threat by shooting the victim. This Court found that the defendant's action of leaving the scene and returning before carrying through with his threat was a delayed consummation of the threat and exhibited a degree of self-control inconsistent with a claim of insanity. Here, Corporal Hazeltine, Mr. Troulliet, and Mr. Morrell all testified that defendant was noticeably agitated at the time he first encountered Corporal Hazeltine directing traffic. As in Milton , we find that defendant's action of leaving the scene after being noticeably agitated and then returning to the scene with loaded weapons, one of which was placed on his dashboard, was a delayed reaction and exhibited a degree of self-control inconsistent with a claim of insanity.
*259 Defendant argues in support of his insanity defense that he did not attempt to evade capture or to conceal evidence, but remained in his truck at the time the assisting deputies arrived. He cites to State v. Armstrong , 94-2950 (La. 4/8/96), 671 So.2d 307, 313, for the contention that the most significant evidence of the ability to distinguish between right and wrong in many insanity cases is evidence of the accused's attempts to hide evidence of the crime. Jurisprudence also reflects that a defendant's flight and attempt to avoid apprehension are circumstances from which a trier-of-fact may infer a guilty conscience. See State v. Jones , 12-750 (La. App. 5 Cir. 5/16/13), 119 So.3d 250, 257, n. 8. We find that the evidence indicated that assisting deputies responded to the scene as they heard Corporal Hazeltine radio in that a suspect was refusing to drop his weapon and overheard shots being fired. The OnStar calls published to the jury also indicate that the incident was ongoing, and thus, defendant may not have had an opportunity to evade capture.
Moreover, despite defendant's assertions, the officers testified that defendant initially refused to drop his weapons. Eventually, defendant did so by tossing the weapons outside his window. Defendant also refused to exit the vehicle so forcefully that the officers were required to tase him multiple times. Even after they tased him, defendant continued to struggle with officers so much that they fell into a nearby ditch with him. Defendant continued to refuse to cooperate as officers placed him into the unit, and also later upon arrival at headquarters for booking and further investigation. Therefore, defendant's actions after assisting officers arrived at the scene aid in lending to the conclusion that defendant knew there were legal consequences stemming from his actions. See Armstrong , supra ; Jones , supra .
The jury, faced with the conflicting psychiatric evidence, obviously rejected the opinion of Drs. Richoux, Salcedo, and Glindmeyer and believed Dr. Thompson that defendant was capable of distinguishing between right and wrong at the time of the offense, despite testimony as to defendant's history with mental illness and the number of medications prescribed to defendant prior to and at the time of the gunfight. If there is conflicting evidence on the issue of insanity, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence, provided the jury was properly instructed and no evidence was prejudicially admitted or excluded. State v. Pettaway , 450 So.2d 1345, 1355 (La.App. 2 Cir. 1984), writ denied , 456 So.2d 171 (La. 1984). The jury's decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. State v. Sharp , 418 So.2d 1344, 1348 (La. 1982) ; State v. Moore , 568 So.2d 612, 618 (La. App. 4th Cir. 1990). In State v. Johnson , 43935 (La. App. 2 Cir. 2/25/09), 3 So.3d 697, 704, expert witnesses disagreed as to the defendant's sanity. The Second Circuit noted that the decision about which witness to believe belonged to the jury and should not be overturned unless an abuse of discretion could be shown. The Court found that the jury gave more credence to the opinions of two of the expert doctors and such a determination was clearly within the jury's discretion and reasonable in the case.
Despite the conflicting expert testimony presented, we find that the record supports the determination made by the jury as to defendant's sanity at the time of the offense. See Milton , supra ; Armstrong , supra ; Jones , supra. Therefore, viewing the foregoing evidence in a light most favorable to the prosecution, we find that any *260 rational trier-of-fact could conclude that defendant failed to prove by a preponderance of the evidence that he was unable to distinguish between right and wrong at the time of the offense.
In conclusion, the jury found defendant guilty of attempted first degree murder. We find that the trial court did not abuse its discretion in denying defendant's motion for a new trial on the basis of sufficiency of the evidence or in denying his motion for post-verdict judgment of acquittal. Viewing the evidence under the Jackson standard, we find that the State proved by its evidence that defendant had the specific intent to kill Corporal Hazeltine, and defendant's actions were not in self-defense. Further, the jury, when faced with conflicting expert testimony, found that defendant did not meet his burden of proof that he was legally insane at the time of the offense. This Court will not re-evaluate the credibility of witnesses or re-weigh evidence. See Bailey , supra . These assignments of error are without merit.
ASSIGNMENT OF ERROR NUMBER TWO
Erroneous jury instruction - "inferred intent"
In his second assignment of error, defendant argues that he was deprived of his right to a fair trial when the trial judge instructed the jury that it could infer that defendant intended the natural and probable consequences of his acts. Defendant argues that this "inferred intent" jury charge allowed the State to prevail on the issue of intent by relying on a presumption, rather than having the jury find beyond a reasonable doubt that defendant had the specific intent to kill Corporal Hazeltine, as required for his conviction of attempted first degree murder. He claims that this alleged erroneous jury instruction created the type of harm present in Sandstrom v. Montana , 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), where an erroneous jury instruction was found to impermissibly shift the burden of proof from the State to the defendant.
Defendant concedes that trial counsel failed to object to this alleged error. However, he asks this Court to apply the exception to the contemporaneous objection rule because of the prejudice to defendant by this alleged error, in that it impermissibly shifted the burden of proof of intent to him and affected the jury's determination of his guilt and his theory of self-defense.
Defendant was charged with attempted first degree murder of a peace officer, which required the jury to find that defendant had the specific intent to kill Corporal Hazeltine. See La. R.S. 14:30 ; La. R.S. 14:27. Accordingly, the trial court was required to instruct the jury on the law of intent applicable to this case. Here, the trial court provided the following instruction to the jury regarding the definitions of criminal intent:
Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal conduct to follow his act or failure to act. General criminal intent is present when the circumstances indicate that the defendant must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. General criminal intent is always present when there is specific intent. Whether the criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances. You may infer that the defendant intended the natural and probable consequences of his acts.
*261 The trial court also instructed the jury that it must find that defendant had the specific intent to kill Corporal Hazeltine to convict him of attempted first degree murder.
La. C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. State v. Cornejo-Garcia , 11-619 (La. App. 5 Cir. 1/24/12), 90 So.3d 458, 462. The standard for reviewing jury charges requires that the charges be read as a whole. State v. Hill , 98-1087 (La. App. 5 Cir. 8/31/99), 742 So.2d 690, 698, writ denied , 99-2848 (La. 3/24/00), 758 So.2d 147. A verdict will not be set aside because of a challenged jury charge unless such portion, when considered in the context of the entire charge, is determined to be erroneous and prejudicial. Id.
La. C.Cr.P. art. 841(A) provides, in part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." The purpose of the requirement of a contemporaneous objection is to put the trial judge on notice of an alleged irregularity so that he or she may cure a legitimate problem and prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. State v. Styles , 96-897 (La. App. 5 Cir. 3/25/97), 692 So.2d 1222, 1228, writ denied , 97-1069 (La. 10/13/97), 703 So.2d 609. A contemporaneous objection allows opposing counsel to reply or to correct the problem and may also prevent the error entirely. State v. Bell , 15-354 (La. App. 5 Cir. 10/28/15), 178 So.3d 234, 242.
On very rare occasions, the contemporaneous objection requirement does not apply. In State v. Williamson , 389 So.2d 1328 (La. 1980), the Supreme Court addressed the issue of erroneous jury instructions even though the defendant failed to object timely because the error related to the very definition of the crime of which defendant was convicted and was of such importance and significance as to violate the fundamental requirements of due process. Further, this Court has previously considered the issue of the correctness of the inference jury instruction even though trial counsels have failed to object to the instruction in the trial court in both State v. Hill , supra , and State v. Ewens , 98-1096 (La. App. 5 Cir. 3/30/99), 735 So.2d 89, 97, writ denied , 99-1218 (La. 10/8/99), 750 So.2d 179. Therefore, we will consider defendant's argument despite trial counsel's failure to object in compliance with La. C.Cr.P. art. 841(A).
In Hill , supra , and Ewens , supra , this Court considered the following language: "You may infer the defendant intended the natural and probable consequences of his act." In both cases, the defendants argued that the trial judges committed reversible error in their instructions on the law of specific intent by including this wording. In both cases, this Court found that the Louisiana Supreme Court had previously approved of the same jury instruction language in State v. Mitchell , 94-2078 (La. 5/21/96), 674 So.2d 250, 255, cert. denied , 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996), and State v. Copeland , 530 So.2d 526, 539 (La. 1988), cert. denied , 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). In Copeland , the Louisiana Supreme Court found that the permissive word "may" immediately preceding the word "presume" did not raise the spectre of a Sandstrom -type problem, where in that matter the trial judge incorrectly instructed the jury that it should presume that a person intends the ordinary consequences of his voluntary acts. Further, the Court noted that the instruction in question was only one of many given to the jury. Id. Likewise, this Court held in Hill *262 and Ewens that the instructions did not create the problem raised in Sandstrom , supra .
Accordingly, we find that both the Louisiana Supreme Court and this Court have approved of the inference language used in the trial court's instruction in the present case regarding intent, have found that it does not set forth a conclusive presumption shifting the burden of proof from the State to defendant, and have found that the instruction was not erroneous. This assignment of error is without merit.
Ineffective assistance of counsel
Defendant also argues that trial counsel's failure to object to the inferred intent jury instruction was ineffective assistance of counsel and asks this Court to grant him a new trial on this basis.[26]
A claim of ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief filed in the trial court, where a full evidentiary hearing can be conducted, rather than on direct appeal. However, it is well settled that when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised by assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Collins , 04-1443 (La. App. 5 Cir. 7/26/05), 910 So.2d 454, 460-61. Upon review, we find the record sufficient to address defendant's ineffectiveness claim as it relates to the inference jury charge.
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the 1974 Louisiana Constitution. In assessing a claim of ineffectiveness, a two-pronged test is employed. The defendant must show: 1) his attorney's performance was deficient; and 2) the deficiency prejudiced him. Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show prejudice for purposes of ineffective assistance of counsel, the defendant must demonstrate that but for counsel's unprofessional conduct, the outcome of the trial would have been different. Effective assistance of counsel does not mean errorless counsel or counsel who may be judged ineffective on mere hindsight. Collins , supra .
Upon review, we find that defendant has not shown how the failure to lodge an objection to a proper statement of the law constitutes a deficient representation of defendant. Further, defendant has made no showing that his counsel was deficient, or even assuming a deficient performance for a failure to object here, how defendant was prejudiced as a result of defense counsel's alleged deficient performance. See State v. German , 12-1293 (La. App. 4 Cir. 1/22/14), 133 So.3d 179, writ denied , 14-0396 (La. 11/26/14), 152 So.3d 897. Defendant's claim that his trial counsel was ineffective is without merit.
ASSIGNMENT OF ERROR NUMBER THREE
Erroneous jury instruction - "attempt"
In this assignment of error, defendant argues that the trial court's instruction regarding the offense of "attempt" was unnecessary and likely to confuse the jury by suggesting that defendant's presence at the scene was sufficient to find him guilty. Defendant argues that the jury misapplied *263 this erroneous instruction in an unconstitutional manner, and as a result, his conviction must be reversed and he is entitled to a new trial. The State responds that the jury instruction was properly included since the trial testimony indicated that defendant left the scene and returned shortly thereafter with his weapons drawn and refused to drop his weapons even after Corporal Hazeltine's commands to do so.
As noted previously, La. C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. Cornejo-Garcia , supra , 90 So.3d at 462. The standard for reviewing jury charges requires that the charges be read as a whole. A verdict will not be set aside because of a challenged jury charge unless such portion, when considered in the context of the entire charge, is determined to be erroneous and prejudicial. Hill , supra , 742 So.2d at 698.
When considering an allegedly improper jury instruction, a reviewing court must determine whether it is "reasonably likely" that the jury applied the challenged instruction in an unconstitutional manner, not whether it is possible that the jury misapplied the instruction. State v. Gatewood , 12-281 (La. App. 5 Cir. 10/30/12), 103 So.3d 627, 634-35. In determining whether it is reasonably likely that the jurors applied the instruction unconstitutionally, the challenged terms are considered in relation to the instructions as a whole. Id. The test is whether, taking the instructions as a whole, reasonable persons of ordinary intelligence would understand the charge. Id.
Prior to closing arguments, a charge conference was held, and defense counsel articulated that the language "[lying] in wait with a dangerous weapon with the intent to commit a crime or search of an intended victim" was inappropriate since there was no testimony that defendant was lying in wait or searching for Corporal Hazeltine with a dangerous weapon with the intent to commit a crime. She argued that the language was suggestive that defendant's presence on the scene was sufficient for the jury to find him guilty of attempt. The State responded that the language was included in the attempt statute, and the trial court overruled the objection, but stated that it thought the objection was "pertinent." The jury was instructed with the following regarding attempt:
Any person who having a specific intent, which has been defined above, to commit a crime does an act for the purpose of intending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended. It shall be immaterial whether under the circumstances he would have actually accomplished his purpose. Mere preparation to commit a crime is not sufficient to constitute an attempt. But, lying in wait with a dangerous weapon with the intent to commit a crime or searching for the intended victim with a dangerous weapon with the intent to commit a crime shall be sufficient to constitute an attempt to commit the offense intended.
During deliberations, the jury asked for clarification of the differences between the charges of "First Degree Murder versus Second Degree Attempting Murder." Defense counsel stated that the jury should re-hear all of the responsive verdicts, but the trial court noted her objection and stated that "those definitions are lost in the verbiage" and re-instructed the jury of the definitions of attempt, first degree murder of a peace officer, and second degree murder.
Upon review, we find that defendant's argument that the trial court improperly and prejudicially charged the jury in its attempt instruction is without merit. In *264 State v. Yarbrough , 91-638 (La. App. 3 Cir. 3/11/92), 596 So.2d 311, 314, writ denied , 92-1044 (La. 5/22/92), 599 So.2d 317, the defendant argued that the phrase "lying in wait" was improperly and prejudicially used by the trial court when defining "attempt" in its jury instructions. The Third Circuit found no error in the charge, as it tracked the language of La. R.S. 14:27, the phrase was not singled out or unduly emphasized, and the charge as a whole was a complete and correct statement of law.
In the present case, after review of the subject charge, we find, like the Court did in Yarbrough , that the trial court properly instructed the jury as to the definition of "attempt" as defined in La. R.S. 14:27. The jury instruction closely tracks the language of the statute, which includes the language of lying in wait with a dangerous weapon or searching for an intended victim with a dangerous weapon as examples of what constitutes an attempt. The phrases were not singled out or unduly emphasized but, rather, were complete and correct statements of law. We find that the jury heard the facts of this case and ultimately found defendant guilty of attempted first degree murder of a peace officer, which was supported by the evidence presented. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER FIVE
Use of evidence of other bad acts
In his fifth assignment of error, defendant argues that the La. C.E. art. 404(B) testimony of several Gulfport police officers at trial regarding two separate prior incidents involving defendant were more prejudicial than probative and were not substantially relevant to this incident.
On January 10, 2017, the State filed its notice of intent to use evidence of other bad acts pursuant to La. C.E. art. 404(B). The State sought to introduce evidence of defendant's prior bad acts of refusing to cooperate with police commands and/or failure to surrender for the purpose of proving intent, plan, or opportunity, knowledge, and/or absence of mistake with regard to refusing to cooperate with police commands and/or failure to surrender in the present case. Specifically, the State sought to introduce testimony and evidence of an August 16, 2012 incident where after Gulfport police were called to defendant's home, defendant barricaded himself inside the residence for nearly two hours, despite the officers' orders for him to exit. The State also sought to introduce testimony and evidence of an October 1, 2014 incident where defendant was subdued by a Gulfport police officer after refusing to follow the officer's commands. In both instances, defendant was found with or had a loaded firearm nearby. Attached to the State's notice of intent were the Gulfport Police Department Offense/Incident Reports stemming from each incident.
On January 20, 2017, defendant filed a memorandum in opposition to the State's notice of intent, wherein he argued that the incidents were irrelevant to the charge of attempted first degree murder because "refusing to cooperate with police commands" was not an element of the charged offense. Defendant further asserted that even if the trial court found the evidence to be relevant, its admission would violate La. C.E. art. 403 as neither incident had any bearing whatsoever on the offense charged because the incidents did not involve defendant firing a weapon, nor illegally possessing a weapon, nor was he convicted of any crimes because of these incidents.
On January 24, 2017, the trial court heard the State's Article 404(B) motion. After hearing the testimony of Sergeant John Barnes and Detective Paul Rhodes *265 regarding the August 16, 2012 incident and the testimony of Sergeant David Wilder and Deputy Michael Hauler regarding the October 1, 2014 incident, the trial court admitted the two prior incidents for the limited purpose of "refusing to cooperate with police commands and/or failure to surrender for the purpose of proving intent, plan or opportunity, knowledge, and/or absence of mistake with regard to refusing to cooperate with police commands and/or failure to surrender in the instant case."
At trial, prior to the start of the Article 404(B) testimony, the trial court gave a limiting instruction to the jury that the following evidence was not to show the innocence or guilt of defendant, but rather defendant's alleged prior bad acts of refusing to cooperate with police commands and/or failure to surrender was to be considered only for the purpose of proving intent, plan, or opportunity, knowledge and/or absence of mistake with regard to refusing to cooperate with police commands and/or failure to surrender in the present case.
The State presented the testimony of Officer Jeffrey Duffield, Sergeant John Barnes, and Detective Paul Rhodes with the Gulfport Police Department who testified regarding the August 16, 2012 incident involving defendant in Gulfport, Mississippi. Officer Duffield testified that on August 16, 2012, he responded to a call to detain defendant at a residence, and in approaching the residence, learned that defendant was in a bedroom with possible access to a weapon. For several minutes, officers commanded defendant to exit the room and the residence, and defendant refused.
Sergeant John Barnes, a supervisor, also arrived at the scene, and a hostage negotiator, Detective Paul Rhodes, was called in as more than five officers surrounded the perimeter of the residence. Detective Rhodes testified that he called defendant on the phone and attempted to build a rapport with him. While Detective Rhodes was on the phone with defendant, defendant stated that he had been in the Navy and had prior law enforcement experience as he worked in Homeland Security. Detective Rhodes asked defendant to exit the room, to which defendant requested that the officers "back up and stand down," and defendant hung up on Detective Rhodes several times. Sergeant Barnes and Detective Rhodes testified that defendant eventually exited the house after approximately two hours of negotiations and after defendant spoke to a friend on the telephone. Upon search of the room in which defendant was barricaded, Officer Duffield recovered a loaded firearm.
Sergeant David Wilder and Officer Michael Hauler testified about the October 1, 2014 incident in Gulfport involving defendant. On that date, Sergeant Wilder and Officer Hauler went to an apartment in response to a complaint. At the time Sergeant Wilder made contact with defendant, he was in the door frame of the apartment and the officers attempted to have him exit the apartment to further speak with him. Sergeant Wilder continued to command defendant out of the apartment as defendant became more agitated and irritated. Both Sergeant Wilder and Officer Hauler described that defendant began to lower his hands and reach towards the back of his waistband. Concerned for the officers' safety, Sergeant Wilder opened the closed screen door and put defendant on the ground. When this happened, Sergeant Wilder and Officer Hauler observed a Glock 40 handgun "flying" to the ground.
At the close of trial, the trial court again charged the jury that the other crimes evidence should be considered for a limited purpose and that the jury should not find *266 defendant guilty because of an offense he may have previously committed.
On appeal, defendant argues that the Article 404(B) testimony of the Gulfport police officers at trial regarding the two separate incidents involving defendant were more prejudicial than probative as the incidents were not sufficiently similar to the circumstances surrounding the gunfight with Corporal Hazeltine. He contends that the Gulfport officers were responding to complaints made by third parties, unlike this incident which did not stem from a complaint and where shots were actually fired. He also argues that the incidents were not substantially relevant to this incident, nor can they rebut his claims that he acted in self-defense or was insane at the time of the charged conduct.[27]
The State responds that the trial court properly found that the probative value of the prior acts outweighed the prejudicial effects because they supported defendant's propensity to refuse to cooperate with law enforcement commands and to refuse to surrender, which proved defendant's intent, plan, knowledge, and/or absence of mistake. It argues that defendant's attempts to draw factual distinctions between the two prior incidents and the present incident fail under the Article 404(B) standard.
La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1) ; State v. Prieur , 277 So.2d 126, 128 (La. 1973). However, when such evidence tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Dauzart , 02-1187 (La. App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
In State v. Taylor , 16-1124 (La. 12/1/16), 217 So.3d 283, the Louisiana Supreme Court recently clarified the procedure by which the State may seek to introduce other crimes evidence under La. C.E. art. 404(B)(1) and Prieur . When the State seeks to introduce other crimes evidence, it is required to provide the defendant with written notice prior to trial of the intent to produce such evidence. When the State does so, the trial court is required to conduct a pretrial hearing to determine the admissibility of the other crimes evidence. Id. This hearing is not intended to be a *267 "mini trial" of the prior offenses. Rather than the "clear and convincing" standard previously required under Prieur , Taylor clarified that when the State seeks to introduce evidence pursuant to Article 404(B), the State need only make a showing of sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act. No specific form of evidence is mandated or prohibited for every case, and sufficiency of the State's evidence must be determined on a case-by-case basis. Id.
Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. Id. Also, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403 ; State v. Page , 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 451, writ denied , 09-2684 (La. 6/4/10), 38 So.3d 299. The burden is on the defendant to show that he was prejudiced by the trial court's admission of evidence of other crimes, wrongs, or acts. State v. Marshall , 13-233 (La. App. 5 Cir. 10/30/13), 128 So.3d 1156, 1160. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed. State v. Le , 13-314 (La. App. 5 Cir. 12/12/13), 131 So.3d 306, 317.
If the element of intent is at issue, evidence of similar unrelated conduct is admissible to negate a defense theory that the accused acted without criminal intent and to show that he intended to commit the charged offense(s). La. C.E. art. 404(B). For evidence of a prior criminal act to be admitted as proof of intent, however, three prerequisites must be satisfied: (1) the prior act must be similar; (2) there must be a real and genuine contested issue of intent; and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Kennedy , 17-0724 (La. 9/29/17), 227 So.3d 243, 244 (per curiam ); State v. Kahey , 436 So.2d 475, 488 (La. 1983).
In the present case, defendant was charged with attempted first degree murder in violation of La. R.S. 14:30 and La. R.S. 14:27, requiring the State to prove that defendant had specific intent to kill, the lack of which was one of defendant's theory of defenses at trial. Accordingly, we find that the other crimes evidence was independently relevant to show a material fact, that being defendant's specific intent, and more specifically, his confrontational and hostile nature towards peace officers. Because defendant claimed he was acting in self-defense, evidence of prior confrontations with peace officers was relevant to show that defendant in fact intended to kill Corporal Hazeltine and did not commit the offense in a sudden passion after being provoked.
Further, we find that defendant's conduct was similar enough during the August 16, 2012 and the October 1, 2014 incidents with the Gulfport Police Department and the April 26, 2015 incident with Corporal Hazeltine to warrant the admission of the prior acts into evidence. In each incident, defendant failed to comply with police orders and instead willfully chose to escalate the situations by continually resisting commands. Also in the incidents, defendant was armed with a loaded firearm nearby and, in one incident, defendant had the firearm on his person and appeared to the officers to be attempting to reach for it. Although defendant argues that the present incident was not similar because it was not the result of a third-party complaint nor were any shots fired in the Gulfport *268 incidents, "it is the similarity of the accused's prior conduct itself that matters." Kennedy , supra , 227 So.3d at 244. Considering the similarities of defendant's prior conduct in each incident, rather than their extraneous details, we find that this prong has been met.
Next, the State listed intent as one purpose for which it intended to use the other crimes evidence. In order to prove that a defendant is guilty of attempted first degree murder, the State is required to establish the defendant had a specific intent to kill the victim and that he committed an overt act tending toward the accomplishment of the victim's death. Girod , supra . Defendant's intent was a real and genuine issue contested at trial. Defendant argued that he lacked the specific intent to kill Corporal Hazeltine because he was legally insane at the time of the offense and alternatively argued that he acted in self-defense.[28] We find that the testimony of the Gulfport police officers showed the improbability that defendant acted in self-defense given his previous confrontational history with peace officers; the second prong is thus met.
As to the third prong, the trial court gave the jury a limiting instruction that the testimony was only to be considered for purposes of defendant's failure to obey or surrender and not to determine his guilt or innocence of the charged offense of attempted first degree murder. Additionally, the nature of the present offense, one where defendant shot Corporal Hazeltine and left him permanently injured, was considerably graver than defendant's prior conduct where he did not fire his weapon at the officers and no one was hurt. Thus, we find that the probative effect of the evidence is weightier than any prejudice arising from its admission. Therefore, the other crimes evidence was admissible at the very least for the purpose of proving intent.
Moreover, the admission of evidence of other crimes is subject to a harmless error review. State v. Jones , 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 244 (citing State v. LaGarde , 07-288 (La. App. 5 Cir. 10/30/07), 970 So.2d 1111, 1123, writ denied , 07-2412 (La. 5/16/08), 980 So.2d 706 ). An error is harmless when the guilty verdict is "surely unattributable to the error." Id.
After review of the record, we find that the jury's verdict was surely unattributable to any alleged error in the admission of the testimony of the Gulfport police officers regarding the prior incidents. It appears likely that the jury's verdict derived from the evidence presented by the State and the testimony of the State's eyewitnesses that defendant shot two weapons nearly twenty times at Corporal Hazeltine, hitting him three times, and then continuing to fire his weapons even after Corporal Hazeltine was disarmed and tried to seek cover behind his unit. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER SIX
Excessive sentence
In his sixth and final assignment of error, defendant asserts that his forty-year sentence at hard labor without benefits is unconstitutionally excessive and grossly disproportionate to the facts of this case.
*269 Defendant argues that he was sixty years old at the time of sentencing and a first-felony offender. He concedes that although his penalty was not the maximum term carried by the statute, it is essentially a life sentence given his age and history of mental illness. He contends that he did not fire his weapon first and was provoked, and that these should be mitigating factors warranting lowering of the term of the sentence.
The State responds that the trial court did not abuse its discretion in imposing defendant's forty-year sentence, which was within the sentencing range of twenty to fifty years. See La. R.S. 14:27(D)(1)(b). It contends that the trial court properly considered the aggravating and mitigating circumstances of this case.
At the sentencing hearing, the trial court heard the victim impact statement from Corporal Hazeltine's wife and defendant's apology for the harm he caused Corporal Hazeltine and his family. The trial court indicated that it had reviewed the PSI report and appears to have considered the sentencing guidelines of La. C.Cr.P. art. 894.1. Particularly, the trial court noted the facts that Corporal Hazeltine could no longer perform his full range of duties as a peace officer and that St. Charles Parish was robbed of "one of the best" due to his loss of vision in one eye. The trial court stated that defendant was lucky to be alive but noted the many lives he endangered. The PSI report reflected defendant's prior confrontations with peace officers, his status as a first-felony offender, and his lack of regard for the safety of everyone involved.[29] After referencing that the PSI report recommended imposing the maximum sentence, the trial court chose to depart from that recommendation and imposed a sentence of forty years at hard labor without the benefit of parole, probation, or suspension of sentence.
Defendant filed a timely motion for reconsideration of sentence under La. C.Cr.P. art. 881.1, arguing that his sentence was excessive given his age, military history, and that the shooting was an incident unlikely to reoccur. At the hearing on the motion to reconsider his sentence, defendant argued that he had no premeditated intent to shoot anyone on that day and was suffering from a mental issue when Corporal Hazeltine shot at him first. He noted his lack of a criminal record, his age, and that Corporal Hazeltine's wife expressed forgiveness. He requested that his sentence be reduced to the minimum twenty-year penalty, but the trial judge denied the motion, after noting that although it was "emotional for everybody," he believed the sentence was appropriate. Defendant raises these same arguments made below now on appeal.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for unconstitutional excessiveness. State v. Smith , 01-2574 (La. 1/14/03), 839 So.2d 1, 4 ; Baham , supra , 169 So.3d at 571. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and *270 purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson , 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey , 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130, writ denied , 08-1649 (La. 4/17/09), 6 So.3d 786. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson , 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. Id.
Defendant's forty-year sentence for his attempted first degree murder of a peace officer conviction is an upper-range sentence. Our courts have upheld similar sentences for similarly situated defendants.
In State v. Laird , 572 So.2d 793 (La. App. 4th Cir. 1990), a sentence of forty years at hard labor for attempted first degree murder of a peace officer was upheld, even though the defendant was a first-time offender, where the defendant stole a car while intoxicated, took a police officer's gun and shot the officer in the back, causing paralysis.
In State v. Falkins , 08-745 (La. App. 5 Cir. 1/27/09), 9 So.3d 190, this Court upheld the defendant's forty-year sentence without benefits for his conviction of attempted first degree murder of a peace officer. There, the officer was investigating a tip regarding people looting nearby when he came into contact with the defendant, one of the suspected looters. When the officer attempted to approach the defendant, the defendant began to run away and pointed and fired a gun at the officer while approximately thirty-five to fifty yards away from him. The officer was not injured. The defendant argued on appeal that he was only twenty-two years old, with a relatively minor prior criminal record at the time of sentencing. This Court found that the sentence was neither illegal nor unconstitutionally excessive in light of the gravity of the offense.[30]
In State v. Apodaca , 50,113 (La. App. 2 Cir. 9/30/15), 180 So.3d 465, 472-73, the fifty-year-old first-felony offender with a *271 history of suicide attempts received sentences of thirty-five years at hard labor for two counts of attempted first degree murder of a peace officer and five years at hard labor for two counts of aggravated criminal damage to property to be served concurrently. The Court upheld the defendant's sentences due to the serious facts of the case, even though the defendant was remorseful and had no criminal history. The facts indicated that the defendant lured officers to where he was and fired shots at them, which led to a standoff lasting several hours. The Court noted that the defendant shot one officer in the shoulder, and his attempt of violence and deliberate injury against peace officers was a grievous offense with serious consequences.
Upon review, we find that the sentence imposed in the present case was not unconstitutionally excessive given the serious and grievous circumstances of this case. Defendant fired two weapons over twenty times near a school zone, during school hours, and along a busy intersection as people drove by. During their first encounter, defendant distracted Corporal Hazeltine, a peace officer who routinely directed the traffic in a school zone, during the performance of his lawful duties, to inform Corporal Hazeltine that he did not know how to do his job and would be calling his supervisor. During the second encounter, Corporal Hazeltine was shot three times and sustained the permanent loss of vision in one eye, as well as a loss of the full faculties required to perform his lawful duties. Defendant fired two guns and the evidence in defendant's truck indicated he had a third loaded weapon nearby. Stray bullets were found lodged in a vacant house located across the four lanes of Highway 90 and in an AT & T van that passed by the scene, and many civilians were placed in danger by defendant's actions.
We find that defendant's violent and deliberate actions against Corporal Hazeltine while performing his lawful duties as a peace officer were a grievous offense befitting serious consequences. See Laird , supra ; Falkins , supra ; Apodaca , supra . Although defendant is a first-felony offender, this was not his first hostile confrontation with peace officers while having a loaded firearm nearby. Therefore, we find the record supports the sentence imposed, and the sentence is not unconstitutionally excessive. This assignment of error is without merit.
ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, State v. Oliveaux , 312 So.2d 337 (La. 1975), and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990).
Upon review, we find that the record fails to indicate that defendant was advised of the time period within which he may seek post-conviction relief. The April 25, 2017 sentencing minute entry reflects that defendant was given notice under La. C.Cr.P. art. 930.8 of the two-year prescriptive period for post-conviction relief, while the transcript fails to indicate that defendant was advised at all of the time period for seeking post-conviction relief. When there is a conflict between the minute entry and the transcript, the transcript prevails. State v. Lynch , 441 So.2d 732 (La. 1983).
It is well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Neely , 08-707 (La. App. 5 Cir. 12/16/08), 3 So.3d 532, 538, *272 writ denied , 09-0248 (La. 10/30/09), 21 So.3d 272 ; State v. Davenport , 08-463 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied , 09-0158 (La. 10/16/09), 19 So.3d 473. Accordingly, by way of this opinion, we advise defendant that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.
CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED

The May 12, 2015 minute entry and the transcript indicate that the issue of defendant's competency to proceed to trial was raised prior to the State's filing of the bill of information. The record reflects that prior to the filing of the bill, defendant filed various motions to appoint a sanity commission and independent health examination experts to evaluate whether defendant was competent to proceed to trial. On May 5, 2015, the trial court granted one of defendant's requests and appointed Drs. Daphne Glindmeyer and Kristin Luscher to independently examine defendant. The trial court also appointed Dr. Richard Richoux and Dr. Rafael Salcedo to the sanity commission to evaluate defendant's competency to proceed to trial.
La. C.Cr.P. art. 642 provides that a defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. It further provides that when the question of the defendant's mental incapacity to proceed is raised, there shall be no steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed. Here, the State chose to file the bill after defendant was found competent to proceed.

This Court has previously held that when the trial judge states that the defendant is sentenced to the "Department of Corrections," the sentence is necessarily at hard labor. State v. Jamison , 17-49 (La. App. 5 Cir. 5/17/17), 222 So.3d 908, 909, n. 2.

Corporal Hazeltine was not wearing his protective gear that day because he felt safe working a traffic detail in a school zone.

Corporal Hazeltine identified defendant in court.

At 8:37 a.m., defendant called 9-1-1 and identified himself as a federal law enforcement officer. He asked to speak with Sheriff Champagne whom he said he knew personally because he played in a band with him in high school. The 9-1-1 operator gave defendant another number to call to reach the Sheriff.

Corporal Hazeltine did not recall seeing a gun on the dashboard during the first encounter with defendant.

Jeff Jones, an employee with General Motors OnStar, provided that the files on the disc introduced into evidence were complete and accurate recordings downloaded from a server where the files are stored in the ordinary course and scope of OnStar's business.

On cross-examination, Corporal Hazeltine testified to as follows:
As I stated, I was slowly starting to back up, and before I had a chance to get behind my unit, Mr. Devillier pointed -- lifted a gun, pointed it in my direction at which time I took that as a, you know, as a lethal threat on my life, so I discharged my firearm in his direction.
Corporal Hazeltine admitted on cross-examination that nowhere in his statement given on the day of the incident does he say that he saw the barrel of a gun over the dashboard pointed at him. He explained after further questioning:
In the statement I gave on the day of the incident, I could not tell you if it was the revolver coming from the dashboard or a possible third weapon because from my point of view, I couldn't tell. And in all honestly, it didn't matter whether it was the same gun or not. He was pointing a gun in my direction, and I was using lethal force to defend myself.

Corporal Hazeltine provided that the policy of the St. Charles Parish Sheriff's Office allows officers to use lethal force to protect themselves or others from force or serious bodily injury and does not require the officer to be shot at first. He also provided that in his thirteen years of service at the time of the incident, he had never discharged his weapon at a suspect.

The fragmented bullet located in Corporal Hazeltine's left eye socket remained because there was too high a risk of damaging the optic nerve by removing it. The bullet in his arm traveled up his arm and remained lodged in the muscles of his back. The third bullet that entered his chest had also lodged itself in his back muscles, but eventually surfaced and was removed.

Detective Chris Waguespack was a patrol deputy working in the area and arrived at the scene as defendant was refusing to exit his vehicle; he went to Corporal Hazeltine who was located behind his unit. He provided Corporal Hazeltine with medical assistance until he recognized Bryan Picou, a paramedic at St. Charles Hospital, passing by and flagged him down. Mr. Picou provided medical assistance until Corporal Hazeltine was transported to the hospital.

"Cowl" is the forward part of the body of a motor vehicle supporting the rear of the hood and the windshield and housing the pedals and instrument panel.

Sergeant Rickey Marlowe testified as the evidence custodian that all items had been under his care, custody, and control.

Mr. Goudeau described "coning" as "[w]hen a bullet strikes a substance such as glass, the exit side will have been blown out, so to speak, and you get this coning effect."

Ms. Cazes described that as a firearms examiner, she determines how firearms function and analyzes ammunition components related to firearms.

Ms. Cazes also stated, however, "[t]he three could have been part of the seven."

Mr. Troulliet described the driver as an older gentleman with "darker hair, gray maybe" and with facial hair, but did not see the person in court.

Ms. Candella testified that she knew Corporal Hazeltine's name from his school traffic duties.

Dr. Richoux defined "psychosis" as a "loss of contact with reality that manifests itself in certain ways."

Dr. Glindmeyer defined a "psychotropic medication" as one prescribed to treat a psychiatric illness, such as depression, anxiety, or psychosis.

Drs. Richoux, Salcedo, and Glindmeyer chose not to conduct the MMPI test on defendant.

When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold , 603 So.2d 731, 734 (La. 1992). As these two assignments relate to whether the evidence was sufficient for defendant's conviction of attempted first degree murder, they are addressed first and together.

La. R.S. 14:30(B)(1) defines a "peace officer" as "any peace officer, as defined in R.S. 40:2402, and includes any ... sheriff, deputy sheriff, local or state policeman ... [or] federal law enforcement officer[.]"

See State v. Tillman , 47,386 (La. App. 2 Cir. 8/8/12), 104 So.3d 480, 489, where the Court noted that although the victims were alive, the location of one victim's injuries in the chest area implied the defendant's specific intent to kill them.

It is noted that the trial judge gave the following instruction regarding self-defense:
A defendant who raises the defense that he acted in self-defense does not have the burden of proof on that issue. The State must prove beyond a reasonable doubt that the Attempted First Degree Murder of Deputy Bert Hazeltine or of a lesser verdict was not committed in self-defense.
This Court has repeatedly held that the burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence. See Howard , supra ; Baham , supra ; State v. Havies , 16-635 (La. App. 5 Cir. 3/15/17), 215 So.3d 457, 463 ; State v. Strickland , 11-715 (La. App. 5 Cir. 3/27/12), 91 So.3d 411, 416. The Third Circuit and Second Circuit have also followed this rule; however, it appears that the Fourth Circuit is split as to where the burden of proof lies. See State v. Barron , 51,491 (La. App. 2 Cir. 8/09/17), 243 So.3d 1178, 1186 (discussing each Circuit's trend regarding the burden of proof when the defendant claims self-defense in non-homicide cases).
In State v. Jackson , 51,841 (La. App. 2 Cir. 1/10/18), 246 So.3d 646, 655, the Second Circuit noted that while the burden of proof was the defendant's by a preponderance of the evidence, the Court in some cases also required that the State must then prove beyond a reasonable doubt that the defendant did not act in self-defense. Id. (citing State v. Williams , 50,004 (La. App. 2 Cir. 9/30/15), 178 So.3d 1051, 1057 ). It noted, however, that the Louisiana Supreme Court has not clearly approved of this additional burden. Id.
Here, defendant did not object to any erroneous jury instruction regarding self-defense, nor has he raised this on appeal. See State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, 140, writ denied , 12-2667 (La. 5/24/13), 116 So.3d 659 (holding that since the defendant did not object to the lack of a jury instruction regarding the burden of proof on self-defense, appellate review was precluded). While it appears that the trial judge shifted the burden of proof to the State to prove defendant did not act in self-defense in contravention to the jurisprudence of this Court, it seems that the jurisprudence does not clearly define or allocate the burden of proving self-defense in a non-homicide case. Further, any potential error appears harmless, as it would have heightened the State's burden of proof at trial to disprove defendant's theory of self-defense to the benefit of defendant. Id. (noting that any error in failing to include the instruction placed a more onerous burden upon the State).

Defendant's argument that trial counsel was ineffective for failing to object to the inferred intent jury instruction was included in assignment of error number four regarding the denial of his motion for a new trial. The State did not address this argument in its appellee brief.

On appeal, defendant adds that the two incidents occurred one hundred miles from the gunfight with Corporal Hazeltine and were not close in time. Thus, he appears to challenge the remoteness of the prior bad acts. At trial, defendant did not object to the admission of the evidence on this basis. A new basis for an objection may not be raised for the first time on appeal. Rather, a defendant is limited to the grounds articulated at trial. See La. C.Cr.P. art. 841 ; State v. Zeno , 322 So.2d 136 (La. 1975) ; State v. Lewis , 04-1074 (La. App. 5 Cir. 10/6/05), 916 So.2d 294, writ denied , 05-2382 (La. 3/31/06), 925 So.2d 1257. Therefore, we find this argument precluded from review on appeal.

Compare State v. Nguyen , 04-321 (La. App. 5 Cir. 9/28/04), 888 So.2d 900, 906, writ denied , 05-0220 (La. 4/29/05), 901 So.2d 1064, where this Court found that the issue of intent was not genuinely at issue at trial because there was no testimony that the shooting was accidental or inadvertent. Rather, in that case, the defendant's defense was one of identity as he claimed he was not the shooter.

The PSI report was included in the sealed exhibits folder of this case. The report is considered confidential under La. C.Cr.P. art. 877. Article 877(A) states that a PSI report "shall be privileged and shall not be disclosed directly or indirectly to anyone" other than the sentencing court, the victim and other specified persons and entities. Article 877(C) provides that "[t]he presentence investigation report, edited to protect sources of confidential information, shall be made a part of the record if the defendant seeks post-conviction relief only on the grounds of an excessive sentence imposed by the court."

See also State v. Jones , 43,053 (La. App. 2 Cir. 2/20/08), 982 So.2d 105, 115-16, writ denied , 08-0710 (La. 10/10/08), 993 So.2d 1282, and State v. Allen , 478 So.2d 589, 599 (La. App. 2 Cir. 1985), writ granted , 491 So.2d 12 (La. 1986), affirmed as amended , 496 So.2d 301 (La. 1986). In Jones , supra , the Second Circuit upheld defendant's convictions of four counts of attempted first degree murder of peace officers and sentences on each count to the maximum sentence of fifty years in prison without benefits to be served concurrently except for the first ten years on two of the counts, which were to be served consecutively to each other, despite the defendant's argument that they were excessive in light of his drug use and psychiatric problems. The Court found that the sentences were justified as he tried to kill four law enforcement officers in a short period of time and engaged in two high-speed pursuits placing the lives of numerous persons in jeopardy. In Allen , supra , the Second Circuit upheld the defendant's maximum fifty-year sentence for attempted first degree murder despite the defendant's argument that the trial court did not consider his mental problems. The Court also noted that the defendant had a history of violence towards police officers and others in positions of authority.